## The Wm. H. Brinsfield.

### Ranstead v. The Wm. H. Brinsfield.

#### (District Court, D. Maryland. March 4, 1889.)

**1. Wharves—Overlapping Vessel—Lien for Wharfage.**

A foreign vessel which came to discharge cargo into a private dock in the city of Baltimore to a wharf where she could not lie without overlapping on the next adjoining wharf, belonging to the libelant, was notified that if she did so overlap she would be charged wharfage. *Held*, in the absence of any statutory regulation of wharfage, that by lying alongside libelant's wharf for the distance of 20 feet the vessel enjoyed a beneficial use of it, although not made fast to it, and not using it to land cargo; and that for such use the libelant was entitled to compensation and a maritime lien.

**2. Same—Amount of Wharfage.**

*Held*, that libelant was entitled to recover as compensation *pro rata* of the customary rate of wharfage in the proportion which the number of feet of his wharf so used contributed to make up the length of the whole berth occupied by the vessel.

*(Syllabus by the Court.)*

In Admiralty. Libel *in rem* for wharfage by Lyman T. Ranstead against the schooner William H. Brinsfield, a foreign vessel.

*Robert H. Smith,* for libelant.

*William H. Cowan,* for respondent.

Morris, J. The libelant is the owner of a wharf fronting 100 feet on a dock made by deepening a canal into the waters of a branch of the Patapsco river, adjoining South Baltimore. This dock is somewhat remote from the customary harbor for vessels in the port of Baltimore, and was constructed by private individual enterprise. The riparian owner of a piece of partially submerged land bordering on a widening of the river, by digging out a canal, and building up its sides, constructed a basin about 100 feet wide, and from 500 to 1,000 feet long, with a street of the city at right angles to its length forming its upper end, and opening out to the river and harbor at the other end. The land on the sides of the dock has been sold and leased in lots, mostly of 100 feet front on the water, to different persons, with the wharf rights appurtenant to each lot. These wharves fronting on this dock, basin, or canal would appear, therefore, to be in the strictest sense private wharves. It is the case of a riparian owner who has cut a canal into his own land so as to allow vessels to come to his own property fronting on it, and then has disposed of portions of the land to different persons. There is nothing in the laws of Maryland or the ordinances of the city of Baltimore granting any privilege to or exacting any duty from such a proprietor, and there is no law or ordinance regulating rates of wharfage, except with respect to the public wharves of the city. So far as any of the land may have resulted from filling up into the contiguous water of the river, it is the law of this state (Code Md. art. 54, § 45) that the proprietor of land bounding on any navigable waters shall be entitled to the exclusive right of improving out into the water in front of his land; and that all improve-

ments and accretions shall pass to the successive owners of the land as incident thereto, provided only that such improvements are so made as not to interfere with navigation. It is further enacted that no patent shall issue from the land-office which shall impair or affect the rights of riparian owners. *Goodsell* v. *Lawson*, 42 Md. 348; *Railroad Co.* v. *Chase*, 43 Md. 23; *Mayor, etc.*, v. *St. Agnes Hospital*, 48 Md. 419; *Yates* v. *Milwaukee*, 10 Wall. 497.

By article 98, § 21, of the Maryland Code, it is enacted that the owner of real estate on any navigable water of the state may construct wharves thereon, and extend the same to such distance into the stream as may be required to admit the safe approach thereto of any vessel navigating said waters. It is a fact that nearly all of the numerous navigable bays and rivers of the state are broad and shallow, and the legislation, on this subject shows that the policy of the state is to encourage riparian owners to make improvements out to the deeper water by vesting in them the same exclusive ownership in the land and improvements so made as they have in the original fast land. In the face of this legislation and policy, it does not seem to me that we should hastily adopt rules with regard to such property on our navigable waters which have been established as reasonable and necessary in other countries with regard to deep tidal rivers or narrow sea-ports, but which are not consistent with that private, exclusive ownership which has been granted by express legislation to riparian owners in Maryland. The exclusive character of the ownership of wharves erected by individual enterprise in this country, in other states than Maryland, has been repeatedly recognized by the supreme court of the United States, subject, of course, to the right of any state to interfere when it deems it advisable, and regulate the compensation which may be exacted, so as to prevent extortion. *Cannon* v. *New Orleans*, 20 Wall. 582. In *Transportation Co.* v. *Parkersburg*, 107 U. S. 699, 2 Sup. Ct. Rep. 732, it is said:

"It is undoubtedly a general rule of law, in reference to all public wharves, that wharfage must be reasonable. A private wharf—that is, a wharf which the owner has constructed and reserves for his private use—is not subject to this rule; for, if any other person wishes to make use of it for a temporary purpose, the parties are at liberty to make their own bargain. That such wharves may be had and owned, even on a navigable river, is not open to controversy. It was so decided by this court in the case of *Dutton* v. *Strong*, 1 Black, 23, and in *Yates* v. *Milwaukee*, 10 Wall. 497."

The supreme court also said in *Ex parte Easton*, 95 U. S. 73:

"Compensation for wharfage may be claimed upon an express or an implied contract according to the circumstances. Where a price is agreed upon for the use of a wharf, the contract furnishes the measure of compensation, and when the wharf is used without any such agreement, the contract is implied, and the proprietor is entitled to recover what is just and reasonable for the use of his property and the benefit conferred. Such erections are indispensably necessary for the safety and convenience of commerce and navigation; and those who take berth along-side them to secure those objects derive great benefit from their use. * * * Such contracts, beyond all doubt, are maritime, as they have respect to commerce and navigation, and are for the benefit of the ship or vessel when afloat, * * * for which, if the vessel or

water-craft is a foreign one, or belongs to a port of a state other than the one where the wharf is situated, a maritime lien arises against the ship or vessel in favor of the proprietor of the wharf. * * * Water-craft of all kinds necessarily lie at a wharf when loading and unloading; and Mr. Benedict says that the pecuniary charge for the use of the dock or wharf is called 'wharfage' or 'dockage,' and that it is the subject of admiralty jurisdiction; that the master and owner of the ship, and the ship herself, may be proceeded against in admiralty to enforce the payment of wharfage when the vessel lies along-side the wharf, or at a distance, and only uses the wharf temporarily for boats or cargo."

In *Dugan* v. *Mayor, etc.*, 5 Gill & J. 357, the Maryland court of appeals has said:

"Over wharfage collected at private wharves, or wharves other than those owned by the town or city of Baltimore, or made at the ends or sides of public streets, lanes, and alleys, the town or city officers have no power or control. Its imposition and collection is the exclusive privilege of the wharf-owners. Anchorage or wharfage may be charged for the use of any place held as mere private property to which vessels may come."

The claim for compensation for the use of his wharf, which libelant seeks to enforce against the schooner in this case, arose under the following circumstances: John F. Fahey and the libelant are the owners or lessees of adjoining lots of ground and wharves fronting upon the basin or dock above mentioned. That of Fahey is next adjoining the street which forms the head of the basin, and is 85 feet front. The libelant's adjoins Fahey's, and is 100 feet front. Fahey carries on a coal, wood, and sand business, and the vessels bringing these commodities to his place are discharged at his wharf. These vessels are frequently more than 85 feet long; and, as the solid head of the dock confines his wharf on one side they necessarily lap over onto libelant's premises. In this particular case the proof shows that the stern of the schooner extended along-side of libelant's wharf 18 to 20 feet beyond Fahey's line, and so remained for two days, while discharging a cargo of cord-wood, her hull amid-ship being close against Fahey's wharf. Notice in writing was given by libelant to the master of the schooner before she hauled into the wharf that if she used libelant's wharf by lapping over in that manner, she would be charged wharfage. It is shown on behalf of respondent that the schooner was not made fast to libelant's wharf, and did not make use of his wharf by discharging any of her cargo upon it, but merely as to so much of her length as extended beyond Fahey's line lay in the water a few feet from the wharf, all her lines being carried to Fahey's wharf. On behalf of the respondent it has been very earnestly contended that, conceding the facts to be as I have found them, the libel cannot be sustained. It is contended that the schooner by simply projecting beyond Fahey's line, and lying in front of libelant's wharf without being made fast thereto, was merely lying in the navigable water in which the libelant has no exclusive ownership, and for the use and occupation of which he could make no claim; that, even if it be supposed that the owner of the schooner might be liable as a trespasser for obstructing libelant's wharf, yet such a claim could give no maritime

lien; that to give a maritime lien there must be some actual use of the wharf beneficial to the vessel, as by making fast to or loading or unloading goods over it.

The respondent's counsel argues that the present case is like the use of a street by a vehicle stopping in front of one man's building to deliver goods, and projecting on the street beyond the line of that building in front of an adjoining one. But it does not seem to me the analogy between the use of the water-way of this private basin and the use of a street is very close. The very purpose of the basin is that vessels may lie in it for the profit of the owners of the wharves abutting on it, and the land bounding on it has been acquired by the several purchasers in order that each may enjoy his opportunity in that profit according to the number of feet he has purchased bounding on the water. Rates of wharfage are usually according to the length or tonnage of the vessel, and it would seem that there must be some vice in an argument which would result in allowing a wharf-owner who has only 85 feet front on such a dock to have the same advantage as the owner of a greater frontage, and to discharge at his wharf vessels of any length by subjecting the property of his neighbors to a servitude against their protest. It may often be that it is for the mutual advantage of such adjoining owners that they shall accommodate each other, and it may often be requisite for the general prosperity of a port that by legislation they shall be required to do so, but, in the absence of law or lawful custom, as to owners upon a water which is not so much a public navigable highway as it is a private basin, it seems to me the only legal right is that of unobstructed access, each to his own wharf. It is urged that by the use and occupation such as it was, the libelant suffered no loss, as he had not at the time any vessel he desired to bring to his own wharf, and the schooner would have been removed to make way for any vessel which was intended for libelant's wharf. The proof, however, with regard to frequent previous occurrences shows that the right to have an obstruction removed upon request was not the equivalent of having libelant's premises unobstructed. There is testimony that the presence of the overlapping vessel has a tendency to deter others from coming to the wharf, and that the annoyance of being constantly obliged to make request and await the removal of the overlapping vessel has been found to drive away tenants and others who would make use of libelant's wharf to his profit. It is true that the use made in the present case is not the usual use which gives a claim for wharfage, but I think there is no doubt that it was a use beneficial to the vessel during the two days that she was lying there discharging her cargo. It does not appear to me that making fast to, or landing upon, or passing goods or passengers over, a wharf, are the only possible ways of using its privileges. A vessel, by lying close along-side for safety or protection, or for opportunity of use in emergency, is getting the benefit and advantage of what has cost the owner outlay to construct and maintain, even though the vessel may be held by anchor, or by moorings made fast to another wharf. In the principal ports in this country charges for wharfage are prescribed and regulated by statutes,

so that most of the adjudicated cases turn upon the construction to be given to the words of the statute; but expressions are found in reported cases tending to show that it is recognized that unless controlled by legislation such uses as the present do give rise to a claim for compensation. With respect to the wharves owned by the state of Maryland within the city of Baltimore an act of the legislature directs that the state wharfingers are to demand and collect a prescribed rate per ton on all vessels lying at or opposite to any public wharf of the city. By another act (Public Local Laws of Baltimore, § 360) it is provided that no vessel shall enter Smith's dock or any other private dock, without first ascertaining whether there is a vacant place at the wharf where she can lie, under a penalty of five dollars, to be paid to the harbor master. In the case of *The B. F. Woolsey*, 16 Fed. Rep. 423, and in *The George E. Berry*, 25 Fed. Rep. 780, Judge Brown, in the Southern district of New York, while admitting that the primary definition of "wharfage" is "the compensation paid for loading goods on a wharf or shipping them off," holds that it may be applied to any vessels afloat enjoying for the purposes of commerce and navigation some substantial benefit, either of protection or safety or in the loading or unloading of cargo. In the case of *The Whitburn*, 7 Fed. Rep. 925, it was held that a vessel which for 24 hours lay across the head of a pier 8 or 10 feet from it, but not attached to it, but attached by cables to the piers next above and below, was liable to the intermediate pier for wharfage. Judge Butler said: "The respondent could make no use of the wharf without incurring liability to pay for it." Under the New York statute which fixes the rate per ton which may be charged any vessel which uses or makes fast to any pier, wharf, or bulk-head, it was held by Judge Benedict, in the case of *The City of Hartford*, 10 Ben. 150, that where a steam-boat 272 feet long had occupied a bulk-head, different portions of which were owned by three different persons, the total wharfage fixed by the statute should be divided among the several owners in proportion to the number of feet each owned.

Several cases have been cited by respondent's counsel which unquestionably do tend to support the theory of the defense. Most important among them is the judgment of the master of the rolls in *Collieries Co. v. Gibb*, L. R. 5 Ch. Div. 713, in which an injunction was granted in favor of the plaintiff, requiring the defendant, who was the owner of a wharf which he used as the entrance to a dry-dock, to remove a floating raft which he had placed in the river Thames in front of his wharf for the purpose of preventing the plaintiff, who owned the adjoining wharf, from employing a large steamer which was so long that it overlapped in front of the gates of defendant's dry-dock. The raft was undeniably a permanent fixed obstruction interfering with the reasonable use of a great public highway of commerce, and obviously unlawful; but, in delivering his judgment, the learned master of the rolls discussed very fully the reciprocal rights of adjoining wharf-owners, and some of the rules announced by him and relied upon by respondent's counsel in this case are, it seems to me, more applicable to the Thames at London, the use of which has been

for centuries regulated by custom, by statutes, and by various boards of control, than they are to a *quasi* private dock, such as the one now in question, which is more akin to the artificially constructed private docks of London. The master of the rolls, however, is careful to say that the use made of the river by one wharf-owner must be reasonable, and not such as to interfere with the reasonable use by the adjoining owner. He says:

"If this defendant [the owner of the dry-dock] had been carrying on the business of a wharfinger, and using it for vessels coming up, I should have held it most unreasonable for the collier to stand in the way to prevent his carrying on his trade in the regular way. It would be, in fact, an attempt by the plaintiffs to appropriate, without payment, the use of the defendant's wharf."

In the present case, Fahey, by having continually at his 85-foot wharf vessels which are much longer, and considerably overlap on the libelant, and by keeping them there during the time required to discharge from each its cargo of sand, wood, or coal, is in fact appropriating without compensation just so much of libelant's wharf, and deterring others from using it, and depriving libelant of wharfage. It is not true of this dock that it is a public highway in the same broad sense that it is true of the river Thames at London. The owner of the surrounding land constructed the dock, and, if all the present owners agreed, I have no doubt they could lawfully fill it up, and make it fast land.

The testimony with regard to the custom and usage in this port with respect to similar private docks is in support of libelant's claim. Mr. Pendegast, who for 22 years has been the collector of wharfage at Smith's dock states the usage there to be that the wharf-owner on whose wharf any vessel may overlap gets his *pro rata* proportion of the whole wharfage collected from the vessel, which is based upon the vessel's tonnage.

The case of *Easby* v. *Patterson*, 6 Wkly. Notes Cas. 318, in the supreme court of Pennsylvania, was rather a case of obstruction than of use, and it was held that as the plaintiff had distinctly refused to allow the defendant to use his wharf, and had cast off the attaching ropes, he could not sustain an action of *assumpsit* based on permissive occupation. In the present case distinct written notice was given the master of the schooner, before he came to the wharf, that if he overlapped onto libelant's premises he would be charged for that use. If I am right in holding that this use was such that libelant may claim compensation for it, then there can be no doubt that by so using the wharf after notice there would arise an implied contract to pay the reasonable worth of it, and that such a contract is cognizable in admiralty, and that, the schooner not being a domestic vessel, there is a lien *in rem.* *Ex parte Easton*, 95 U. S. 68; note to *Ouachita* v. *Aiken*, 16 Fed. Rep. 894.

I will sign a decree in favor of the libelant for his proportionate share of the whole wharfage proved to be customary for a vessel of this size; the libelant being entitled to the proportionate share which his wharf contributed to make up the whole length of the berth occupied by the schooner.