# GREENLEAF JOHNSON LUMBER COMPANY *v.* GARRISON, SECRETARY OF WAR.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 678.   Argued February 24, 25, 1915.—Decided April 12, 1915.

The power of the sovereign State or Nation is perpetual—not exhausted by one exercise—and all privileges granted in public waters are subject to that power; the exercise of which is not a taking of private property for public use but the lawful exercise of a governmental power for the common good. *West Chicago R. R.* v. *Chicago,* 201 U. S. 506.

When one acting under state authority erects anything in navigable waters he does so with full knowledge of the paramount authority of Congress to regulate commerce among the States and subject to the exercise of such authority at some future time by Congress. *Union Bridge Co.* v. *United States,* 204 U. S. 364.

The power of the States over navigable waters is subordinate to that of Congress and the State can grant no right to the soil of the bed of navigable waters which is not subject to Federal regulation. *Philadelphia Co.* v. *Stimson,* 223 U. S. 605; *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 269.

The power of Congress extends to the whole expanse of a navigable stream and is not dependent upon the depth or shallowness of the water.

The United States is not liable under the Fifth Amendment to compensate the owner of a wharf erected in navigable waters for the removal of that part of the structure outside of the new lines properly established by Federal authority, although the wharf was originally erected within the harbor lines then duly established by both the state and Federal authorities.

In this case the action of the Secretary of War in establishing new harbor lines within those previously established was not so wanton and arbitrary as to subject it to judicial review, if such action were subject to review.

The mooring of vessels is as necessary as is their movement and can equally be made the basis for increasing the navigability of a river whether for trading vessels or war vessels.

The judgment of Congress as to whether a construction in or over a river is or is not an obstacle and hindrance to navigation is an exercise of legislative power in respect to a matter wholly within its control and is conclusive. *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 269.

208 Fed. Rep. 1022, affirmed.

THE facts, which involve the right of the owners of a wharf erected under state authority in navigable waters of the United States to compensation on the taking thereof by the United States, are stated in the opinion.

*Mr. J. L. Jeffries,* with whom *Mr. L. D. Starke* was on the brief, for appellant:

The appellant's right to recover damages is based on the character of this title and the ownership of the State in the submerged soil.

The State has authority as to the disposition of submerged lands and the character of ownership which is acquired under grants of rights and privileges from the State or from Congress is property that cannot be taken without compensation. Congress cannot now take such property when acquired and constructed under the authority of the State or of Congress granted in the interest of navigation.

In support of these contentions see Code of Virginia, §§ 1338, 1339, 2010, 2011; *Commonwealth* v. *Alger,* 7 Cush. 53; *Cummings* v. *Chicago,* 188 U. S. 410; 1 Farnham on Water Rights, pp. 50, 136, 510, 511, 551, 552, 569; *Gibson* v. *United States,* 166 U. S. 269; *Gring* v. *Ives,* 222 U. S. 365; *Grinnell* v. *Daniels,* 110 Virginia, 874; *Homer* v. *Pleasants,* 7 Atl. Rep. 691; *Illinois Cent. R. R.* v. *Illinois,* 146 U. S. 387; *Lake Shore &c. R. R.* v. *Ohio,* 165 U. S. 365; *Lewis* v. *Portland,* 35 Pac. Rep. 256.

*Oyster Co.* v. *Briggs,* 229 U. S. 82 and *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, can be distinguished from the case at bar. 1 Lewis Em. Domain, §§ 76–b, 78;

*Monongahela Nav. Co.* v. *United States,* 148 U. S. 312; *Montgomery* v. *Portland,* 190 U. S. 89; *Norfolk City* v. *Cook,* 27 Gratt. 430; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605; *Prosser* v. *Nor. Pac. Ry.,* 159 U. S. 59; *American School* v. *McAnnulty,* 187 U. S. 94; *Scranton* v. *Wheeler,* 179 U. S. 141; *S. C.,* 57 Fed. Rep. 803; *Shiveley* v. *Bowlby,* 152 U. S. 1; *Stockton* v. *Balto. & N. W. R. R.,* 32 Fed. Rep. 19; *Sullivan Timber Co.* v. *Mobile,* 110 Fed. Rep. 186; *Taylor* v. *Commonwealth,* 102 Virginia, 759; *Union Bridge Co.* v. *United States,* 204 U. S. 364; *United States* v. *Buffalo Pitts. Co.,* 234 U. S. 228; *United States* v. *Lynah,* 188 U. S. 445; *Weems Steamboat Co.* v. *Peoples Co.,* 214 U. S. 345; *Yates* v. *Milwaukee,* 10 Wall. 497.

*Mr. Assistant Attorney General Underwood* for appellees:

The Secretary of War was authorized to establish harbor lines and require the removal of appellant's wharf under the act of March 3, 1899, 30 Stat. 1151.

The judgment of Congress and Secretary of War in this matter is not reviewable or if reviewable, no facts have been shown to warrant review.

The removal of appellant's wharf, without payment of compensation, will not contravene the Fifth Amendment.

The title to the bed of a navigable stream within the State, is subject to Congress's control over navigation.

The State's dominion over navigable waters ceases when the United States assumes control.

There is no estoppel in favor of appellant.

The State cannot limit the control of Congress over navigable waters.

The structure involved in this case was erected without state authority.

In support of the Government's contention see, *Atlee* v. *Packet Co.,* 21 Wall. 389; *Bloomfield* v. *Charter Oak Bank,* 121 U. S. 121, 135; *Boston Chamber of Commerce* v. *Boston,*

217 U. S. 189, 195; *C., B. & Q. Ry.* v. *Drainage Com'rs,* 200 U. S. 561, 593; *Gibbons* v. *Ogden,* 9 Wheat. 1, 196; *Gibson* v. *United States,* 166 U. S. 269, 272, 276; *Gilman* v. *Philadelphia,* 3 Wall. 713, 725; *Groner* v. *Foster,* 94 Virginia, 650, 651; *Hannibal Bridge Co.* v. *United States,* 221 U. S. 194; *Jackson* v. *United States,* 230 U. S. 1, 23; *Juragua Iron Co.* v. *United States,* 212 U. S. 297, 303; *Oyster Co.* v. *Briggs,* 229 U. S. 82, 87, 88, 89; *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177.

*Mongahela Nav. Co.* v. *United States,* 148 U. S. 312, 315 and *United States* v. *Lynah,* 188 U. S. 445, can be distinguished from the case at bar. See *New Orleans Gas Co.* v. *Drainage Comm.,* 197 U. S. 453; *Pennsylvania* v. *Wheeling Bridge,* 18 How. 421; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 634, 637, 638; *American School* v. *McAnnulty,* 187 U. S. 94, 109, 110; *Scranton* v. *Wheeler,* 179 U. S. 141, 163; *Shively* v. *Bowlby,* 152 U. S. 1, 40; *South Carolina* v. *Georgia,* 93 U. S. 4; *Stockton* v. *Baltimore & N. Y. R. Co.,* 32 Fed. Rep. 9, 20; *Transportation Co.* v. *Chicago,* 99 U. S. 635; *Union Bridge Co.* v. *United States,* 204 U. S. 364, 400; *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53; *Weber* v. *Harbor Commissioners,* 18 Wall. 57; *Weems Steamboat Co.* v. *People's Co.,* 214 U. S. 345; *West Chicago R. R.* v. *Chicago,* 201 U. S. 506, 521, 523, 526; *Williamette Bridge Co.* v. *Hatch,* 125 U. S. 1, 12–13; *Yates* v. *Milwaukee,* 10 Wall. 497; see also 25 Stat. 400, 425; 26 Stat. 426, 455; 30 Stat. 1121, 1151; 36 Stat. 1265, 1275; Act of Virginia Assembly, February 18, 1875; Laws of Virginia, 1874–1875, p. 82; Code of Virginia, 1904, §§ 1338, 1339.

MR. JUSTICE McKENNA delivered the opinion of the court.

Suit for injunction by appellant, which we shall call complainant, brought originally against Henry L. Stimson as Secretary of War and Robert Shaw Oliver as Assistant

Secretary of War, for whom the appellees were substituted and whom we shall refer to as defendants, to enjoin them and all persons acting under their authority from taking or removing or in any way interfering with complainant's wharf or other property "along or upon the water front of its said property upon the southern branch of the Elizabeth river" in the State of Virginia. It having been constructed, it is alleged, under the authority of the State and within and upon the harbor line subsequently established by the Secretary of War, it became, it is further alleged, property lawfully owned and could, therefore, be removed only upon payment of just compensation.

A preliminary injunction was granted in accordance with the prayer of the bill.

There was a demurrer to the bill, urging, among other grounds, that the court was without jurisdiction of the persons of the defendants and also without jurisdiction of the suit because it was one against the United States. These grounds were subsequently waived and the want of equity in the bill alone relied on.

The demurrer was overruled, 204 Fed. Rep. 489, and the present defendants, substituted as parties defendant, answered.

The answer, by certain denials and admissions, in effect repeated the propositions of the demurrer and asserted the control of Congress over the river, acting through the Secretary of War, adducing 30 Stat. 1153, and concluded with a prayer that the court order the demolition of such portions of the wharf and other property as might be found to be outside the re-established pier-head line and that the injunction theretofore granted be dissolved and complainant's bill dismissed.

Further detail of the pleadings is unnecessary as a statement of facts was made which presents all that are necessary for a decision. From the statement it appears that a board of harbor commissioners was created by

Virginia in 1875 and that in 1876, the exact date not known, the authorities of the State of Virginia established a harbor line which remained until 1890, when the same was adopted by the Secretary of War as the harbor line established by the Federal Government, and it so remained until "the recent establishment of the present harbor line June 12, 1911, which was so established by the Secretary of War, after notice, etc., and that until said new line was established, no part of complainant's property was outside of the same." It appears from the statement and diagram attached that complainant had constructed two certain fills into the Elizabeth river. It made extensions into the river from two points on the shore and connected at the outer extremities, the wall forming a continuous wharf of three sides surrounding the water they inclosed, the fourth side being the high land. The space so surrounded was called a log pond and designed for the storage of logs for the purposes of complainant's business. The following also appears from the statement:

"That on the 22nd day of July, 1911, the Navy Department wrote to the complainant stating that that Department intended making certain improvements in the Navy Yard and requesting the complainant to fix a price at which it would sell so much of its property or wharf and log pond as lay without the present port warden's line. The complainant answering said letter stated that the matter would be laid before its board of directors on July 26, 1911, and thereafter the attached correspondence was had between the Navy Department and the complainant. That while the above paragraph is admitted as a fact, it is nevertheless objected to by the defendants for the reason that the same is not relevant or material to the decision of this case and it is claimed by said defendants, Secretary of War and Assistant Secretary of War, that this admission does not bind them.

"That the water now immediately in front of complainant's property is navigable, but if the present structures are removed to the present harbor line as demanded by the Government the complainant will be cut off from navigable water unless the river is dredged where the structures now are. That an act of Congress approved March 4, 1911, entitled "An Act making Appropriations for the Naval Service for the year ending June 30, 1912, and for other purposes" (c. 239, 36 Stat. 1265, 1275), has been passed, in which Act an appropriation has been made for dredging the bottom of the river at the point in controversy, pursuant to which the Government proposes to widen the channel to the new port warden's line.

"It is further admitted that the fee simple title to the high land to low water mark adjacent to the port warden's line in question, is in the Greenleaf Johnson Lumber Company, the complainant in this suit.

"The reëstablished or new harbor line runs along the front of complainant's wharf at the northern end of the property, cutting off approximately two [200] feet of the same."

There was some oral testimony, of which it is enough to say that it identified certain descriptive maps of the property. It also showed the purpose for which the property was constructed and used, and its present condition, the description of the new line and its relation to the old one, and that "the entire change made by the establishment of the new harbor line is immediately in front of the Navy Yard," and that "the Government in recent years had used the channel of the river opposite the Navy Yard and in front of the property of complainant to a very large extent for the storage of its vessels," and a witness had seen as many as five abreast, ranging from torpedo boats to colliers.

The District Court overruled the demurrer, as we have said, expressing its views in an opinion. The court also

denied the mandatory injunction prayed by the United States and continued the temporary restraining order. Subsequently the court entered its decree adjudging that the Secretary of War had no authority under the law to remove or cause to be removed the structures mentioned in the pleadings and decreed that the temporary injunction be made permanent. The decree was reversed by the Circuit Court of Appeals. 208 Fed. Rep. 1022.

Two propositions are presented: (1) The power of Congress over navigable waters. (2) Whether the acts of the Secretary of War were done in the exercise of that power.

. It would seem that the existence of the power of Congress has been withdrawn from the domain of discussion by many authorities, and that little room is left for debate as to the extent of that power. But a distinction is made by complainant between structures in a river which avail of its navigability and structures which may be an obstruction to its navigation. Upon this distinction, which will be explained more fully hereafter, complainant contends that a right of property by the privilege granted by the State of Virginia became vested in it which can only be taken upon payment of just compensation. And this distinction, it is further contended, explains the cases relied on by counsel for the United States and sustains the authority of the cases adduced by complainant. A review of the cases, therefore, is worth while.

The power of Congress is expressed in a general way in *Gilman* v. *Philadelphia*, 3 Wall. 713, 731, in which a certain power was conceded to the States but necessarily to be exercised, it was decided, in subordination to the supremacy of the national power. "Until the dominant power of the Constitution is awakened," it was said, "and made effective, . . . the reserved power of the States is plenary."

In *Gibson* v. *United States*, 166 U. S. 269, there was a further expression of the principle and an application of

it to riparian ownership, and it was decided that "all navigable waters are under the control of the United States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various States and individual owners under them, it is always subject to the servitude in respect to navigation created in favor of the Federal Government by the Constitution." Citing, among other cases, *Shively* v. *Bowlby*, 152 U. S. 1. The case was one for the recovery of damages caused by the construction of a dike in the Ohio river, by which the lands of Gibson were flooded. Relief was denied and the principle expressed that the exercise "of the dominant right of the Government" over navigation subjected riparian ownership to such consequence and it was said that an appropriation for improvement was an exercise of the power of Congress.

In *Scranton* v. *Wheeler*, 179 U. S. 141, access was cut off from a navigable river by improvements instituted by authority of Congress. This was said: "All the cases concur in holding that the power of Congress to regulate commerce, and therefore navigation, is paramount, and is unrestricted, except by the limitations upon its authority by the Constitution." The words "except by the limitations upon its authority by the Constitution" were not intended to qualify the power expressed, as is made manifest by subsequent cases.

In *C., B. & Q. Ry.* v. *Illinois*, 200 U. S. 561, the railway company was required to reconstruct a bridge to subserve a public work. The bridge had been constructed under lawful authority. Compensation, however, was denied, the bridge being over a public highway. The latter and public waters were considered analogous.

In *West Chicago Railroad* v. *Chicago*, 201 U. S. 506, a tunnel was constructed by permission of Chicago under the Chicago river and was subsequently required to be lowered. It was held not a taking of property, the removal

of the tunnel having been required in the interest of navigation. In other words, the paramount right of navigation was decided to be superior to riparian rights or rights in the river—or, to put it more generally, to rights in the submerged lands. The case seems directly against complainant in the case at bar. Complainant asserts a right of compensation because it conformed to the harbor line as located by Virginia and by the United States; in other words, contends that it acquired a vested right. The case decides otherwise, and 200 U. S. 561, *supra*, so decides. The proposition announced was that the power of the sovereign, state or National, is perpetual—not exhausted by one exercise—and all privileges granted in public waters are subject to it; and that the exercise of the power was not a taking of private property for a public use but "the lawful exercise of a governmental power for the common good."

*Union Bridge Co.* v. *United States*, 204 U. S. 364, 400, conspicuously displays the principles of the prior cases cited and followed by it. A bridge was required to be altered or changed, the expense of which was great. It was contended that the bridge had been erected under state authority, to the exercise of which the United States had impliedly assented, and that, therefore, the requirement to alter it was a taking of property without compensation. The opposing contention of the United States was that the requirement was an exertion by Congress of its power to regulate commerce, and therefore navigation, upon the waterways on and over which such commerce was conducted. The latter contention was sustained upon a review of the prior cases. It was said that when the company "exerted the power conferred upon it by the State, it did so with the knowledge of the paramount authority of Congress to regulate commerce among the States" and subject to the possibility that Congress at some future time would exert its power.

In *Monongahela Bridge Co.* v. *United States*, 216 U. S. 177, 194, again the doctrine of the other cases was repeated. A bridge erected over the navigable waters of a State by the authority of the State was declared subject to the paramount authority of Congress to regulate commerce and its right to remove unreasonable obstructions to navigation. Congress exerted its power in a provision in the river and harbor bill of March 3, 1899, giving authority to the Secretary of War, when he had good reason to believe a bridge over navigable waterways was an unreasonable obstruction to navigation, to order it to be removed after notice and hearing. The court declined to modify its holding in *Union Bridge* v. *United States*, and declared that it adhered "to what was said in that case" and sustained the Secretary without much discussion.

*Hannibal Bridge Co.* v. *United States*, 221 U. S. 194, was another case of bridge removal. It is not so positive an authority as the preceding cases, for Congress had reserved the right to alter or amend the act under which the bridge was constructed. But the *Union Bridge Case* was quoted from as correctly expressing the Congressional power.

*Philadelphia Company* v. *Stimson*, 223 U. S. 605, is directly to the effect that Congress may establish harbor lines, and is not precluded thereby from changing them. There was action by the State and twice by the United States and the relation of such actions and the rights derived therefrom were considered and determined. Rights under the action of the State were asserted by the Philadelphia Company and assumed to exist by the court in determining the power of Congress. It was said (page 634): "The exercise of this power [that of Congress] could not be fettered by any grant made by the State of the soil which formed the bed of the river, or by any authority conferred by the State for the creation of obstructions

to its navigation." And again, "It is for Congress to decide what shall or shall not be deemed in judgment of law an obstruction of navigation. . . . The principles applicable to this case have been repeatedly stated in recent decisions of this court." The cases which we have reviewed were cited. In speaking of the effect of the first action of the Secretary as affecting his second action, it was said, "That officer did not exhaust his authority in laying the lines first established in 1895, but was entitled to change them, as he did change them in 1907, in order more fully to preserve the river from obstruction. And, in none of the acts complained of, did he exceed the power which had been conferred."

*Philadelphia Company* v. *Stimson, supra,* is an epitome of all prior cases. Indeed we might have relied upon it as furnishing all of the elements of decision of that at bar. It expressed the subordination of the power of the States to the power of Congress, that one exercise of the power by either does not preclude another exercise by either, and that the State can grant no right to the soil of the bed of navigable waters which is not subject to Federal regulation. There was a repetition of this doctrine in *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53.

*Yates* v. *Milwaukee,* 10 Wall. 497, is not in antagonism to the principle announced in those cases. If it could be so regarded it would have to give way to the many cases decided since. But it cannot be so regarded. It was decided, it is true, that one of the rights of a riparian owner was that of access to a navigable river and of constructing a landing wharf or pier for his own use and that of the public, but the limitation or subordination of these rights to be regulated by the dominant power of Congress was not involved nor passed on. And certainly no limitation was implied. The case was referred to in *Scranton* v. *Wheeler, supra,* and "the point adjudged" said to be that, as there was no proof in the record that the wharf involved

was in fact an obstruction to navigation or a nuisance, except a declaration to that effect in the city ordinance attacked, the wharf could not be made such by a mere declaration. And it was observed that "a proper disposition of the case required nothing more to be said." See *Shively* v. *Bowlby*, 152 U. S. 1, 40.

We have recognized that the States have a certain control and management over the navigable streams within their territory, but subject to be superseded by the interference of Congress. *Gilman* v. *Philadelphia, supra; Pound* v. *Turck*, 95 U. S. 459; *Escanaba Co.* v. *Chicago*, 107 U. S. 678. When Congress acts, necessarily its power extends to the whole expanse of the stream, and is not dependent upon the depth or shallowness of the water. To recognize such distinction would be to limit the power when and where its exercise might be most needed. In *Scranton* v. *Wheeler*, 179 U. S. 141, the water was very shallow between the high land and the pier erected in the river by authority of Congress and which it was contended cut off access to navigability.

But, as we have said, complainant distinguishes between the rights a riparian owner may receive, "between those rights," to quote counsel, "which do not relate to navigation in any sense, and second, those which do relate thereto, and which contribute to the enjoyment thereof." To support the distinction *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 335, as construed in *Oyster Co.* v. *Briggs*, 229 U. S. 82, is adduced. The argument is that the right or privilege which complainant received from Virginia was given by the State "in the performance of the dominant trust for the benefit of the public" and not, as in the cases urged by defendant, "in the interest of the individual riparian owners." And it is declared that the cases referred to and *Ill. Cent. R. R.* v. *Illinois,* 146 U. S. 387, makes it clear "that when grants of rights or privileges are made within the authority of the

State, property acquired thereunder becomes as stable as
any other property, and the rights and privileges so granted
are irrevocable, and if taken for public use it must be upon
the payment of just compensation." It is hence contended
that when the State or Congress acts in fulfillment of its
trust for the benefit of the public the structures it author-
izes become fully protected under the Constitution, and in
thus encouraging facilities for navigation and commerce
"Congress loses none of its authority of regulation, be-
cause it can at any time exercise the right of eminent do-
main, and the expense will be a most profitable invest-
ment in the public interest."

The contention is plausible, but it is not supported by
the cited cases, and the case relied on by complainant is
reconcilable with them. It is true the instances in the
cited cases were the removal of structures not facilities
of commerce on the rivers. But the principle declared in
the cases and which determined their decision was not
dependent upon such instances, and the power of Congress
was said to be analogous in its illimitable exertion to
the police power. Illustrative cases were adduced. How
then, it may be asked—indeed, is asked—shall we account
for *Monongahela Navigation Co.* v. *United States*, 148 U. S.
312, as construed in *Oyster Company* v. *Briggs*, 229 U. S. 82?
It was said in the latter case that the former rested upon
estoppel.

A few words of explanation become necessary. The
Monongahela Company, under the express authority
of the State of Pennsylvania, expended large sums of
money in improving the Monongahela River by means of
locks and dams, which were also built at the instance and
suggestion of the United States. By means of the im-
provements the river, which theretofore was navigable
only for boats of small tonnage and at certain seasons of the
year, accommodated large steamboats at all seasons and
an extensive commerce by means thereof. Subsequently

Congress authorized the purchase of the property, or, if its price could not be agreed on, its condemnation, but excluded from the estimate of the sum to be paid for it a consideration of the franchise to collect tolls. It was held that the franchise was a part of the property and should be paid for, notwithstanding its exclusion by Congress and that the franchise, the right to take tolls, could "no more be taken without compensation than" could "its [the company's] tangible, corporeal property." The court said, by Mr. Justice Brewer, "This lock and dam connected the lower improvements already made by the Navigation Company with the upper improvements proposed to be made by Congress, and the appropriation by the latter [act of March 3, 1881] was conditioned on the company's undertaking their construction. This is something more than the mere recognition of an existing fact; it is an invitation to the company to do the work; and when in pursuance of that invitation, and under authority given by the State of Pennsylvania, the company constructed the lock and dam, it does not lie in the power of the State or the United States to say that such lock and dam are an obstruction and wrongfully there, or that the right to compensation for the use of this improvement by the public does not belong to its owner, the Navigation Company."

This language was quoted in *Oyster Co.* v. *Briggs* as sustaining the view that the case rested upon estoppel—rested upon the fact that the lock and dam had been constructed "at the instance and implied invitation of Congress." It is true a great deal was said by Mr. Justice Brewer which seemed to be of broader import, but we are now only concerned with the explanation of the case by the later case, and we may observe that the *Union Bridge Case, supra,* was referred to for comparison. It is manifest, therefore, that the *Monongahela Navigation Co. Case* can be distinguished from the other cases and its ruling

sustained upon the following grounds: (1) The lock and dam were built at the instance of Congress, not as a simple facility for the navigation of the river but as making its navigability, enlarging its capacity from the accommodation of boats of small tonnage at certain seasons of the year to the accommodation of large steamboats at all seasons. (2) The Navigation Company was invited to make the improvements, and so far invested with the rights of sovereignty. It did not, as did complainant in the case at bar, exercise the rights of a riparian owner, building to the harbor line and availing itself of the navigability of the river for its own interest. It, to repeat, constructed a public work, having no other power to do so but the authority conferred upon it by the State and by Congress—invited, indeed, to do so and given as its compensation a right to take tolls for the use of the works. This court well said that such right was as much the consideration of the service rendered as the material property constructed. The case, therefore, as Mr. Justice Lurton said in the *Oyster Co. Case,* rested on estoppel. Whatever was said beyond that may be left, as it was left in the latter case, to a comparison with the *Union Bridge Case,* the principle it declares and the cases it cites.

Something is attempted to be made of *Gring* v. *Ives,* 222 U. S. 365, by complainant in support of its distinction between rights held "subject to the dominant trust in which the beds of navigable streams are held, and those conferred in the exercise and in aid of the purpose of the dominant trust under which the submerged soil is held for the benefit of the public." The case does not support the distinction. A marine railway was constructed under state authority and had been in existence for eighteen years but projected beyond a harbor line subsequently established by Congress. It was run into recklessly and injured by a tugboat, and in defense of an action for the injury the fact of the projection beyond the harbor line was set

up. The defense was rejected, the lower court deciding that even if the railway had been erected illegally, even if it was a public nuisance, the tugboat was not authorized to run into it unnecessarily and negligently as the evidence tended to show. The case was brought here, a Federal question being based on the act of Congress under which the harbor line over which the marine railway projected was established. The question was pronounced frivolous and the writ of error was dismissed.

The contention of the tugboat owner was practically that the railway was an outlaw subject to be destroyed by anybody, although it had been erected by authority of the State and its existence indulged by the Secretary of War. Manifestly the contention was without any merit whatever, as was said by the court, and there was no implication of the existence of the distinction urged by complainant, nor implication of the want of power in the Secretary of War to have ordered the railway removed if he had thought it in the interest of commerce to have done so.

It is, however, contended that the jurisdiction to establish harbor lines is given by the statute only "where it is made manifest to the Secretary of War that the establishment of harbor lines is essential to the preservation and protection of harbors," and that it is shown by the agreed statement of facts and the correspondence attached thereto that the Secretary of War acted at the suggestion of the Navy Department for the improvement of the river opposite the Norfolk Navy Yard and in pursuance of the act making appropriations for the naval service for the year ending June 30, 1912, c 239, 36 Stat. 1265, 1275; and that this was "the sole purpose of the change in the harbor lines and the required removal of the company's [complainant's] property is shown by the additional fact that it appears that the United States moors abreast its war vessels, colliers and other vessels in front of its Navy Yard, so that

they project out in the channel which it so uses for the storage of its vessels."

We may grant that such was the inducement and such the occasional use, but neither militates against the validity of the power exercised. The mooring of vessels is as necessary as their movement, and the navigability of a river can be maintained or increased as legally for the accommodation of war vessels as for trading vessels, those of public ownership as well as those of private ownership, and we cannot enter into a consideration of what may be necessary for either purpose.

It was said in *United States* v. *Chandler-Dunbar Water Co.*, 229 U. S., at page 64: So unfettered is the "control of Congress over the navigable streams of the country that its judgment as to whether a construction in or over such a river is or is not an obstacle and a hindrance to navigation, is conclusive. Such judgment and determination is the exercise of legislative power in respect of a subject wholly within its control." And in *Scranton* v. *Wheeler*, 179 U. S. 141, 162: "Whether navigation upon waters over which Congress may exert its authority requires improvement at all, or improvement in a particular way, are matters wholly within its discretion; . . ." This power has been exercised by the act of March 3, 1899, delegating to the Secretary of War the power to establish harbor lines and, necessarily, to require the removal of structures which project beyond them. *Union Bridge Company* v. *United States*, 204 U. S. 364.

If it can be said that arbitrary or wanton action of the Secretary of War would be subject to judicial review, it cannot be said that his action in the case at bar reached that bad degree.

*Decree affirmed.*

Mr. Justice McReynolds took no part in the consideration and decision of this case.

MR. JUSTICE LAMAR, dissenting.

I dissent from the judgment by which the appellant's wharf is physically taken, its existing right of access to navigable water destroyed, and its private property appropriated to public use without compensation.

At, above and below the Norfolk Navy Yard, the navigable part of the Elizabeth River is 600 feet in width. In 1873 appellant's wharf was built opposite the Navy Yard, through shallow water out to the navigable channel of the stream. Several years afterward, under authority of the State of Virginia, the Norfolk Wardens established a port line which ran along the edge of this channel and left the Lumber Company's wharf and logging pond outside of the harbor.

In 1890, fourteen years later, the Secretary of War established exactly the same line; and thus by City, state and Federal authority the plaintiff's wharf was shown to be a lawful structure outside of the harbor and not an obstruction to navigation either in law or in fact. Since that date there has been no change in the condition of the stream; and the wharf remained a lawful structure until 1911 when,—having decided to widen the river at that point, as a place of storage for war vessels,—Congress in that part of the Act of March 4, 1911 (36 Stat. 1275) relating to the Navy Yard at Norfolk, made an appropriation of $80,000 *"for the purchase of land and widening the channel."* Accordingly, on June 12, 1911, the harbor line was changed, at this particular point, so as to take in the part of the river intended to be widened, but leaving the Norfolk harbor line otherwise unaffected. No one understood, however, that fixing the line 200 feet further inland at this place for this naval purpose authorized the taking of plaintiff's wharf without compensation. And the act of Congress so obviously included the property of the plaintiff, as a part of that to be *purchased*, that the Secre-

tary of the Navy on July 22, 1911, "wrote to the complainant stating that that Department intended making certain improvements in the Navy Yard and requesting the complainant to fix a price at which it would sell so much of its property or wharf and logging pond as lay without the present Portwarden's line."

The complainant named a price which the Department considered exorbitant, and—the parties failing to agree—the Government began proceedings in the District Court of the United States

"to acquire title by condemnation to a certain piece of land, situated in the southern branch of the Elizabeth River, Virginia, held and owned by the Greenleaf Johnson Lumber Company, which is needed for public uses and purposes; that is to say for deepening and widening the said South Branch of the Elizabeth River, as authorized by Act of March 4, 1911 (36 Stat. 1275)."

The statutory notice was given the owner and a jury was impanelled to assess the value of complainant's property, when, suddenly, the proceedings were dismissed and, what was a wharf—lawfully erected in a non-navigable part of the stream and outside of the old line,—was declared to be "a menace to navigation."

The control which Congress has over navigable waters by virtue of the power to regulate commerce is practically unlimited, except in one particular. The Fifth Amendment was passed for the purpose of restraining the exercise of that or any other power by which private property was taken. *Monongahela Co.* v. *United States*, 148 U. S. 336; *McCray* v. *United States*, 195 U. S. 61 (3). That Amendment was intended to protect the citizen against the Government; and being the expression of the fundamental policy of a people, both able and willing to pay, should be given a broad and liberal construction. Congress in directing that the Elizabeth River should be widened distinctly indicated its intention that the private property

needed for that purpose should be "purchased." The Secretary of the Navy so understood the statute and began proceedings to ascertain the amount the Government should pay for the property of the appellant needed for widening the river. In the absence of absolutely controlling authority, requiring a different interpretation, the complainant should receive the payment intended by Congress and demanded by the Constitution wherever private property is taken for a public use. But there is no such authority cited, for none of the decisions relied on by the Government sustain the contention that, on facts like these, wharf property can be taken without compensation.

Some of the cases cited make a distinction between *taking* and *damaging*, and then hold that the owner cannot recover for consequential damages resulting from making public improvements in navigable waters. (*Scranton* v. *Wheeler*, 179 U. S. 141). Another holds that the title of the riparian owner to oysters in the bed of a body of public water is inferior to the right of the Government to deepen the channel in the interest of commerce. *Lewis Oyster Co.* v. *Briggs*, 229 U. S. 82. Another related to a case where a power dam had been constructed under a revocable license. It was held that the owner acquired no such right in the flow in the stream as would give him a claim for damages when the Government, in the interest of navigation, caused the water to run in another channel. *United States* v. *Chandler*, 229 U. S. 53. Another holds that where the Government had constructed a dam, which raised the level of the river and backed the water beyond the old harbor line, the person who purchased *after the dam was built* could not complain because he was prevented from building a wharf inside the new harbor lines which had been changed to conform to the new line of deep water. But the right of the person who owned the land before the dam was built was expressly left open for future

decision. *Philadelphia Co.* v. *Stimson,* 223 U. S. 627. In some of the cases it appeared that bridges had been built subject to the power expressly reserved to order them removed. *Hannibal Bridge Co.* v. *United States,* 221 U. S. 194. Several of the cases hold that those who build bridges or tunnels across the navigable channel of a stream can be required at their own expense to raise or lower the structures whenever they become obstructions to navigation. *Union Bridge Co.* v. *United States,* 204 U. S. 364; *West Chicago R. R.* v. *Chicago,* 201 U. S. 506.

But no case has been cited which holds that a wharf, in shallow water, outside an established harbor line, can be declared an obstruction to navigation, the property taken and the owner ousted of possession without compensation.

On the contrary, *Yates* v. *Milwaukee,* 10 Wall. 497, distinctly holds that this cannot be done. There the City, by the act of 1854, had authority 'by ordinance to establish dock and wharf lines and to prevent obstructions in the river and to cause it to be dredged.' Thereafter Yates built a wharf, across the harbor line, through the shallow water out to the navigable channel of the Milwaukee River. Subsequently a new line was established (505) and in 1864, the city declared, as the Secretary did here, that the wharf (inside the harbor line), was an obstruction. This court said:

"The mere declaration by the city council of Milwaukee that a certain structure was an encroachment or obstruction did not make it so, nor could such declaration make it a nuisance unless it in fact had that character." (505)

Again, speaking of the land-owner's right to build docks, the court said:

"This riparian right is property, and is valuable, and, though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously de-

stroyed or impaired. .It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and if necessary that it be taken for the public good, upon due compensation."

There is a remarkable similarity between the facts in the *Yates Case* and the present. There the dock was to be 'removed in pursuance of a general scheme of widening the channel and in improving the navigation of the Milwaukee River.' Here Congress appropriated $80,000 'to purchase land and to widen the channel' of the Elizabeth River in the interest of the Navy Yard. But even such governmental purposes would not justify a taking without payment; for, in the *Yates Case*, the court concluded its opinion by the use of language which is absolutely applicable to the present controversy, saying:

"If the authorities of the city of Milwaukee deem its [the wharf's] removal necessary in the prosecution of any general scheme of widening the channel and improving the navigation of the Milwaukee River, they must first make him compensation for his property so taken for the public use."

That case has never been overruled and is a notable illustration of the meaning of the Fifth Amendment, which, standing between the Government and the private individual, provides a means by which the interests of the public can be secured without destruction of the rights of the citizen.

Most of the wharves in the United States were located many years before the adoption of the act conferring power upon the Secretary of War to establish harbor lines. Congress did not intend to destroy existing rights (*Montgomery* v. *Portland,* 190 U. S. 105) and it is inconceivable that it could have intended to vest that officer with the power to declare that these lawful structures, worth hundreds of millions of dollars and useful agencies of commerce, were obstructions to navigation merely because

they were inside of a line which he might decide to run in non-navigable water.

The present case is even stronger, for the complainant's wharf is located outside of a harbor line which had been established in 1890 by the Secretary of War himself. The wharf was not an obstruction to navigation when it was built in 1873; it was not an obstruction to navigation when the Secretary established the line in 1890; it has not become an obstruction to navigation during the years it has remained in shallow water, and, under the *Yates Case*, cannot be made an obstruction in fact by declaring (where there has been no change in the stream), that it is such in law.

Few cases directly in point can be found, but out of the multitude which deal with the principle involved, the facts and rulings in the following tend to sustain the appellant's right to compensation for the wharf taken for public use: *Dutton* v. *Strong*, 1 Black, 1; *Railroad Company* v. *Schurmeir*, 7 Wall. 272; *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 336; *Commonwealth* v. *Alger*, 7 Cush. 53, 103; *Langdon* v. *Mayor of New York*, 98 N. Y. 129, 161; *Kingsland* v. *Mayor of New York*, 110 N. Y. 570, 574; *Fitchburg R. Co.* v. *Boston & M. R. Co.*, 3 Cush. 71; *Hamlin* v. *Parpoint*, 141 Massachusetts, 57; *Lewis* v. *Portland*, 25 Oregon, 133, 167; *B. & O. R. R. Co.* v. *Chase*, 43 Maryland, 35–36; *Classen* v. *Chesapeake Co.*, 81 Maryland, 259.

The power of the Secretary of War to run harbor lines may not be exhausted when once exercised, and, from time to time, they may be relocated over unused and submerged land. But as against lawful structures, the line must be run to conform to the physical conditions of the stream and to meet changes occasioned by the washing of the water or other natural causes. But the public cannot determine to widen the river, artificially create a channel, and thus, by its own act, acquire a right to declare

that what was formerly a lawful structure in shallow water will be an obstruction to a storage basin to be artificially created.

In *Commonwealth* v. *Alger*, 7 Cush. 53, 103, it is strongly intimated that the power to establish harbor lines does not confer authority to take, without compensation, existing structures lawfully built out to the navigable channel. Other cases hold that the establishment of the line is in the nature of an invitation to fill in and build out to that line. *Sherman* v. *Sherman*, 18 R. I. 506. So here the action of the Secretary of War in 1890 "is to be construed as a regulation of the exercise of the riparian right; it settles the line of navigability above which the State will not interfere; and is an implied concession of the right to build, possess and occupy, which amounts practically to a qualified possessory title. *Miller* v. *Mendenhall*, 43 Minnesota, 95, citing *Hamlin* v. *Parpoint*, 141 Massachusetts, 51. See also *Langdon* v. *Mayor*, 98 N. Y. 129, 161; *City of Brooklyn* v. *New York Ferry Co.*, 87 N. Y. 204, 206, and *Williams* v. *Mayor of New York*, 105 N. Y. 429.

The action of the Secretary of War in 1890 in establishing a harbor line was, in effect, a declaration that wharves outside of the limits of that harbor thus marked and defined were not obstructions to navigation and, as against existing wharfs, the line could not thereafter be changed except to meet natural changes in the channel. Congress in authorizing the Secretary of War to *establish lines*, clearly indicated an intention to secure fixity and permanency. If such was not its intention, then—as shown by the actual results in the present case—nothing could be more unstable than the tenure by which riparian owners hold docks, piers and wharves. For, progressively, it is said that the builders cannot rely on grants from the State; they cannot rely on lines fixed by the Port Wardens of the State; and it is now decided that they cannot rely on a line fixed by the Secretary of War. For, under the

ruling in the present case, he can, by running a new line, take in 200 feet of a wharf outside of an old line and then oust the owner from the possession and use of that property without compensation.

The wharf here involved may not be of great value, but my view of the harm done the Appellant and of the possibility of like serious consequences to a multitude of persons who have built and invested in these costly and useful instrumentalities of commerce compel me to dissent from the judgment.