**NELSON BROS. BOND & MORTGAGE CO. (STATION WIBO) v. FEDERAL RADIO COMMISSION (JOHNSON–KENNEDY RADIO CORPORATION et al., Interveners).**

**NORTH SHORE CHURCH OF CHICAGO, ILL. (STATION WPCC) v. SAME.**

Nos. 5530, 5533.

Court of Appeals of the District of Columbia.

Argued May 2, 1932.

Decided Dec. 5, 1932.

Levi Cooke, of Washington, D. C., for appellant Nelson Bros. Bond & Mortgage Co.

Levi Cooke and Edward Clifford, both of Washington, D. C., for appellant North Shore Church.

Thad H. Brown, D. M. Patrick, and Fanney Neyman, all of Washington, D. C., for Federal Radio Commission.

M. W. Willebrandt, of Washington, D. C., for intervener Johnson-Kennedy Radio Corporation.

Bethuel M. Webster, Jr., and Paul M. Segal, both of Washington, D. C., for intervener Strawbridge & Clothier.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

ROBB, Associate Justice.

Appeals from a decision of the Radio Commission granting the application of the Johnson-Kennedy Radio Corporation (Station WJKS) of Gary, Ind., that it be assigned the 560 kc. frequency shares by Stations WIBO (owned by the Nelson Bros. Bond & Mortgage Company) and WPCC (owned by the North Shore Church) of Chicago, Ill.

Station WJKS commenced broadcasting in August, 1927, with a frequency of 1,290 kc. and 500 watts power, sharing time with Station WSBC of Chicago. Under the reallocation in November, 1928, the station was assigned a frequency of 1,360 kc. and shared time with Station WGES of Chicago. Shortly thereafter, as a result of its complaint to the Commission of interference, the station was granted a power output of 1,250 watts daytime and 1 kw. nighttime, and continued to operate on that frequency and power. In February, 1931, the station applied for the frequency of 560 kc. and unlimited time, and suggested that, if the granting of its application "would require the removal of a station or stations using the facilities requested in an overquota State of the fourth zone, then the applicant desires Stations WIBO and WPCC, Chicago, as the stations to be removed." The application was designated for hearing before the chief examiner and notice given appellants and other parties in interest. Over a period of seven days voluminous testimony was taken.

After a careful review of the established facts, the examiner recommended that the application be denied. He found that the station is rendering a commendable public service on its present part-time assignment, but that the service "would be improved by the installation of the most modern radio equipment and the operation of this station in the most efficient manner on its present frequency." He further found that it is possible that "more objectionable interference would result from the operation of Station WJKS on the 560 kc. channel than now results from the operation of this station at Gary on the 1,360 kc. channel, since Station WNOX at Knoxville, Tenn., is separated from Gary by a distance of only 440 miles, whereas the nearest station on applicant's present assigned frequency, operating with 1 kw., is at Syracuse, N. Y., separated from Gary by a distance of 600 miles." He also found that

Stations WIBO and WPCC "are meritorious stations, serving public interest, convenience, and necessity"; that "the owners and operators of these stations have at great cost prepared themselves to exercise the broadcasting privileges heretofore granted them by the Federal Radio Commission, and in the opinion of the examiner, clear and sound reasons of public policy demand that these broadcasting privileges be not taken from them and assigned to applicant station"; that Stations WIBO and WPCC provide radio service for people within the service area of the applicant station, who also "receive a large proportion of their radio broadcasting service from stations operating in the State of Illinois, *none of which service may be charged against the quota of the State of Indiana.*" (Italics ours.)

Exceptions to the report were filed by the Johnson-Kennedy Radio Corporation, of which appellants received notice. Thereafter, without notice to appellants or other parties in interest, the Commission filed a statement of facts and grounds for its decision, together with its order, stating the issue to be "whether or not the public interest, convenience, and/or necessity would be served by the granting of this application and the consequent forfeiture of the facilities now assigned Stations WIBO and WPCC." The decision of the examiner was reversed, and the application of the Johnson-Kennedy Radio Corporation granted. The Commission found that the applicant station "now renders an excellent public service in the Calumet region (in which Station WJKS is located) and the granting of this application would enable that station to further extend and enlarge upon that service"; that the "granting of this application and deletion of Stations WIBO and WPCC would work a more equitable distribution of broadcasting facilities within the fourth zone."

■ We have held that the business of broadcasting, being a species of interstate commerce, is subject to the reasonable regulation of Congress. Technical Radio Lab. v. Fed. Radio Comm., 59 App. D. C. 125, 36 F.(2d) 111, 66 A. L. R. 1355; City of New York v. Fed. Radio Comm., 59 App. D. C. 129, 36 F.(2d) 115; Chicago Federation of Labor v. Fed. Radio Comm., 59 App. D. C. 333, 41 F.(2d) 422; KFKB Broadcasting Ass'n v. Fed. Radio Comm., 60 App. D. C. 79, 47 F.(2d) 670; Journal Co. v. Federal Radio Comm., 60 App. D. C. 92, 48 F.(2d) 461; Trinity Methodist Church v. Fed. Radio Comm., 61 App. D. C. 311, 62 F.(2d) 850.

The question, therefore, in this case is whether the decision of the Commission assigning to the applicant station the frequency enjoyed by Stations WIBO and WPCC since 1928 "and the subsequent forfeiture" of the assignment held by Stations WIBO and WPCC is a reasonable exercise of regulatory power or an arbitrary and capricious assertion of power.

Station WIBO was established in April, 1925, and represents a total cost of about $346,000, less a reserve for depreciation of about $54,000. It employs 55 persons; has monthly operating expenses of from $16,000 to $18,000. It serves a radius of from 50 to 100 miles, and, on the basis of its earnings, is estimated to be worth between $500,000 and $700,000. There is not even a suggestion that it has failed to comply in any respect with the regulations of the Commission; on the contrary, it affirmatively appears that this station has been operated in the public interest.

Station WPCC was established in July, 1924, and is owned by the North Shore Church of Chicago. Prior to the installation of this broadcasting station, the church was largely in debt. The installation of the radio greatly increased the church's audiences. There are 20 radio stations in Chicago broadcasting about sixty hours of religious programs on Sundays, but there are practically no weekday spiritual programs broadcast except those of Station WPCC. That the operation of this station has been in the public interest clearly appears.

In the reallocation of 1928 following the enactment of the Davis Amendment (Act of March 28, 1928, § 5, 45 Stat. 373 [47 USCA § 89]), the Commission found that conditions warranted the assignment of the frequency of 560 kc. to Station WIBO (originally established in April, 1925) and Station WPCC (originally established in July, 1924), and the assignment of the frequency of 1,360 kc. to Station WJKS (originally established in August, 1927). The evidence fails to disclose that there has been a material change in conditions since the reallocation of 1928.

The Davis Amendment declared it to be the policy of Congress that the people of the five zones established by the Radio Act of 1927 are entitled to equality of radio broadcasting service, both of transmission and of reception, and that, in order to provide such equality, the licensing authority shall, as nearly as possible, make and maintain an equal allocation of broadcasting licenses, bands of frequency or wave lengths, periods of time for operation, and of station power,

to each of the zones, "and shall make a fair and equitable allocation of licenses, wave lengths, time for operation, and station power to each of the States, the District of Columbia, the Territories and possessions of the United States within each zone, according to population."

It will be observed that the statute directs the licensing authority to establish and maintain, "as nearly as possible," equality of broadcasting service to each of the several zones, and to "make a fair and equitable allocation of licenses," etc., to each of the states within those zones. The requirement that there shall be an equal allocation to each of the zones, and "a fair and equitable allocation" to the states within each zone, according to population, is significant. Crawford v. Burke, 195 U. S. 176, 190, 25 S. Ct. 9, 49 L. Ed. 147; Johnson v. United States, 225 U. S. 405, 415, 32 S. Ct. 748, 56 L. Ed. 1142; Brewster v. Gage, 280 U. S. 327, 337, 50 S. Ct. 115, 74 L. Ed. 457. The fourth zone, in which the stations directly involved in this controversy are located, comprises the states of Indiana, Illinois, Wisconsin, Minnesota, North Dakota, South Dakota, Iowa, Nebraska, Kansas, and Missouri. Congress declared that the people of all the zones are entitled to equality of broadcasting service, but evidently recognized that the licensing authority might not be able to establish and maintain an exact mathematical equality among the zones, hence the language, "establish and maintain as nearly as possible." After providing for the establishment and maintenance of nearly equal facilities among the zones, Congress, in dealing with the problem, evidently anticipated that greater difficulty would arise in undertaking to equalize allocations to the several states within a zone, and therefore provided for, not equal, but "fair and equitable allocation" to the states within a zone. The House committee report on the amendment states, inter alia: "This amendment looks to the future. It declares in terms the duty of the licensing authority to make an equal allocation among the five zones, of broadcasting licenses, * * * and provides that within each zone there shall be an equitable allocation among the States thereof in proportion to the population and power. The equality here sought is not an exact mathematical division. That may be physically impossible." H. R. Rep. No. 800, 70th Cong., 1st Sess.

 We have repeatedly held that "it would not be consistent with the legislative policy to equalize the comparative broadcast-

ing facilities of the various states or zones by unnecessarily injuring stations already established which are rendering valuable service to their natural service areas." Reading Broadcasting Co. v. Fed. Radio Comm., 60 App. D. C. 89, 48 F.(2d) 458, 459; Chicago Fed. of Labor v. Fed. Radio Comm., 59 App. D. C. 333, 41 F.(2d) 422. In Strawbridge & Clothier v. Fed. Radio Comm., 61 App. D. C. 68, 57 F.(2d) 434, we sustained the Commission, although the applicant station was in an underquota state and an underquota zone, and sought an increase of power which would have affected stations in an overquota state in an overquota zone. There would have been more justification for the granting of the application in that case than in this, for here the parties most affected are in one zone and the applicant station is located within 30 miles of Chicago, from which Gary and surrounding territory receives much of its radio service, although, as observed by the examiner, none of that service is charged against the Indiana quota. While Station WJKS, through this application, seeks greater opportunity to furnish broadcasting service to the people of Gary and surrounding territory, it is in evidence that it even now devotes from two to three hours daily to broadcasting phonograph records. It also suggests that it has special programs for the foreign-born element of Gary, but the record discloses that the total number of foreign born in Chicago is greater than in Gary and vicinity.

Station WIBO had been broadcasting for more than two years, and Station WPCC more than three years, when Station WJKS entered the field. The only apparent reason for granting the application of Station WJKS and destroying the other two stations is that Indiana is underquota, which in the circumstances furnishes no substantial justification for the decision of the Commission. As already observed, the evidence discloses that Stations WIBO and WPCC have been and are "serving public interest, convenience, and necessity" certainly to as great an extent as the applicant station. In our view, the conclusively established and admitted facts furnish no legal basis for the decision of the Commission. In other words, the decision is in a legal sense arbitrary and capricious.

 Another point remains. Appellants complain that the decision of the Commission was rendered without notice to them. Not having sought a hearing, appellants are not in a position to raise this question. Goldsmith v. United States Board of Tax Appeals, 270 U. S. 117, 46 S. Ct. 215, 70 L. Ed. 494.

The decision is reversed, and the case remanded.

Reversed and remanded.

GRONER, Associate Justice (dissenting).

I regret I am not able to concur in the opinion of the court in this case. In point of fact, the controversy involves a contest between a radio station now located in Gary, Ind., and two stations now located in Chicago, Ill. The Indiana station now operates on the frequency of 1,360 kc.—the Chicago stations on a frequency of 500 kc., sharing hours of operation. The Indiana station applied to the Commission for a modification of station license, and requested the frequency 560 kc. used by the two Chicago stations. The Commission granted the application. The opinion reverses this decision. I think it should be affirmed.

The question for decision, as it appears to me, is the right and power of the Radio Commission, in the public interest, to refuse to renew the license of a station in an overquota state and transfer its facilities to an applicant station in an underquota state. The answer, and the conditions on which the answer depends, requires an examination of the Act of March 28, 1928, known as the Davis Amendment (45 Stat. 373, § 5, title 47 US CA § 89), which provides:

"Sec. 5. The second paragraph of section 9 of the Radio Act of 1927 is amended to read as follows:

" 'It is hereby declared that the people of all the zones established by section 2 of this Act [47 USCA § 82] are entitled to equality of radio broadcasting service, both of transmission and of reception, and in order to provide said equality the licensing authority shall as nearly as possible make and maintain an equal allocation of broadcasting licenses, of bands of frequency or wave lengths, of periods of time for operation, and of station power, to each of said zones when and in so far as there are applications therefor; and shall make a fair and equitable allocation of licenses, wave lengths, time for operation, and station power to each of the States, the District of Columbia, the Territories and possessions of the United States within each zone, according to population. The licensing authority shall carry into effect the equality of broadcasting service hereinbefore directed, whenever necessary or proper, by granting or refusing licenses or renewals of licenses, by changing periods of time for operation, and by increasing or decreasing station power, when applications are made for licenses or

renewals of licenses: Provided, That if and when there is a lack of applications from any zone for the proportionate share of licenses, wave lengths, time of operation, or station power to which such zone is entitled, the licensing authority may issue licenses for the balance of the proportion not applied for from any zone, to applicants from other zones for a temporary period of ninety days each, and shall specifically designate that said apportionment is only for said temporary period. Allocations shall be charged to the State, District, Territory, or possession wherein the studio of the station is located and not where the transmitter is located.' "

We have had occasion recently to examine the extent of the right conferred on the owner of a radio broadcasting station, and in Trinity Methodist Church, South, v. Federal Radio Commission, 61 App. D. C. ——, 62 F.(2d) 850, decided this term, held that such right is permissive only, and, under the commerce clause, within the regulatory power of Congress. We said in that case, as we have said in previous cases, that interstate radio broadcasting is interstate commerce, and that one who engages in interstate commerce does so subject to the regulatory power of Congress, and therefore obtains no property right to be free from the exercise of that power. In the Trinity Church Case we stated the test to be whether the restrictive measures which Congress may apply from time to time are reasonably adapted to secure the purposes and objects of regulation. In such cases the enforcement of the regulation without compensation is not an unconstitutional taking of property, or without due process of law. Atlantic Coast Line v. Goldsboro, 232 U. S. 548, 558, 559, 34 S. Ct. 364, 58 L. Ed. 721. In the decision referred to we reached the conclusion that the power of Congress over the channels of interstate transmission was coextensive with the power of Congress over the navigable waterways of the country, and we called attention to the rule last announced by the Supreme Court in the case of Greenleaf-Johnson Lumber Co. v. Garrison, 237 U. S. 251, 35 S. Ct. 551, 59 L. Ed. 939, which was a case where the owner of a wharf, constructed pursuant to the permission of the state prior to the assertion by the government of authority over the river, was required to demolish it without compensation when the government asserted its power and changed the lines of navigability.

Section 9 of the Radio Act of 1927, as amended by section 5 of the Act of March 28, 1928, which I have quoted above, authorizes the Commission, in granting or refusing a license, or renewal of license, to bring about equality of broadcasting service in the different zones, into which the country is divided by section 2 of the act (47 USCA § 82), and to allocate the licenses, etc., *within the zones* proportionately between the states comprising the zone, according to population. The debates in Congress prior to the adoption of the act of 1927 indicate a recognition by Congress of the well-known fact that, prior to the passage of the act, chaotic conditions existed in the broadcasting field. There were within fifty miles of Chicago forty stations, of New York thirty-eight, of Philadelphia thirty-two, and of San Francisco twenty-two. It was this unequal distribution of the limited number of wave lengths, etc., and the recognition of the principle that equality of service within the several states depends in considerable measure on a proper distribution of operating stations within the states, that induced the passage of the Davis Amendment. The amendment is a determination of policy by Congress, for its preamble declares: "It is hereby declared that the people of all the zones * * * are entitled to equality of radio broadcasting service, both of transmission and of reception." And, since it is based on the equality of privilege among the several states, it is neither unreasonable nor arbitrary. Nor can it be properly insisted there is any conflict between the requirements of the amendment and the standard of public interest prescribed by the original act. The former of necessity yields to the latter. The Commission must take into consideration public convenience, interest, and necessity, and, if and when these be satisfied, then the standard of sectional equality is mandatory and should be applied.

The record here discloses that the state of Illinois is 55 per cent. over quota, while the state of Indiana is 22 per cent. under quota. Indiana has only sixteen stations of any power, only four of which are full-time stations, as compared to thirty-seven stations assigned to and operating in Illinois. Indiana has only one station with as much power as 5 kw., and that is only a part-time station, while eleven of the thirty-seven stations located in Illinois have power ranging from 5 to 50 kw. In these circumstances it is obvious that, if the Davis Amendment is to be applied, its terms are controlling in the conditions existing here, and this brings me to consider whether, in view of the terms of the amendment, the decision of the Commission is capricious, unreasonable, or arbitrary.

The opinion of this court entirely ignores

the findings of the Commission, but relies on those of the examiner, which the Commission expressly overruled. In so doing I think the court is substituting its own conclusions for those of the Commission, and I had assumed that, in view of the change in the statute (46 Stat. 844, 47 USCA § 96), this might not be done, especially since it is not claimed that there was any irregularity in the proceedings or error in the application of the rules of law.

Summarized, the Commission's findings of fact are that intervener's (the Indiana station) then service was in all respects excellent, and that the granting of the application would extend and enlarge this service; that the effect of the withdrawal of appellants' (the Chicago stations) permits would not militate in any respect against persons (the public) now within the area of those stations, nor the granting of the application (of the Indiana station) increase interference within that area with any other station; that the granting of the application would work a more equitable distribution of broadcasting facilities within that zone, and would serve the public interest, convenience, and necessity. The evidence, I think, sustains these conclusions.

It shows that the two Chicago stations operate together under temporary and revocable renewal licenses granted and accepted *"subject to such action as the commission may take after hearing on the application filed by" the Gary (Indiana) station.* One of the Chicago stations (Nelson Bros. Bond Company) had been in operation since 1925, and by original permit of the Radio Commission since November 27, 1927, at which time it was assigned to 560 kc. frequency in collaboration with the other appellant station (North Shore Church). It is affiliated with the National Broadcasting Company's chain program broadcasting. Its companion station (North Shore Church) uses only the time from 12:30 to 4:30 p. m. and 7 to 8 o'clock p. m. on Sunday, and from 12 to 12:30 p. m. each day. Its broadcasts are exclusively religious in character. The evidence shows that both stations were complying in all respects with the rules and regulations of the Radio Commission. Their area included the Calumet district served by intervener. It was determined by the Commission, however, that their withdrawal from the air would still leave that, as well as all other territory served by them, fully served by other stations broadcasting in the main substantially the same programs, and the evidence bears out this finding.

Intervener's station is located at Gary, Ind., and, at the time of its application for greater facilities, was able to reach only a few miles outside the city proper. Beyond that it was subject to serious interference. Gary is a town of about a hundred thousand people, and the "Calumet territory" surrounding it has a population of approximately a million people, who depend upon the steel industry for a living. Nearly two-thirds are of foreign birth. Intervener provides programs to meet the needs of this foreign population. Several witnesses described the station as the "community center." Its programs are arranged to meet the wishes of each nationality, and are rendered both in English and the languages of the different nationalities. Among its special features are English speaking programs, religious broadcasts, Americanization, amateur broadcasts by children, and community activities broadcasts. There is evidence in the record to support the Commission's finding that on its present frequency it is not able to operate satisfactorily. To avoid this trouble and to meet the needs of the workers in Gary, and in that neighborhood, who, in normal times, work with three shifts on a full twenty-four hour day, it asks for full time and a change in frequency.

Epitomized, therefore, the evidence shows that all three stations concerned are now rendering satisfactory service, but that the operation of the two Chicago stations may be terminated without detriment to the public interest, and that the service of the Indiana station may be improved and extended in the public interest by granting to it the facilities now enjoyed by the other two. Coupled with this is the fact that the Chicago stations are located in an overquota state and the Indiana station in an underquota state. More than this is unnecessary if the intent of Congress, as expressed in the amendment, is to be given effect, for Congress has conferred on the Commission, in the first place, just as it had in the case of the Interstate Commerce Commission, the power to determine what is and what is not in the public interest, and, in the second place, has admonished it, when this condition is met, to "make a fair and equitable allocation of licenses, wave lengths, time for operation, and station power to each of the States, the District of Columbia, the Territories and possessions of the United States within each zone, according to population." In the instant case, the Commission has declared that, by reason of the character of the population in the Calumet district, its foreign origin, its hours of service, and

such like matters, it is entitled to and ought to receive in the fullest measure possible the sort of program provided by the Gary station. This is no more than the recognition of a difference in sectional interests and conditions and an extension of the opportunity to those interests to gratify their local tastes. This was the purpose and object of the amendment.

If, therefore, upon an application for a station permit in an underquota state, or for an increase of facilities by an already authorized station, the Commission, after hearing, decides the public interest will be served by granting the application, and the evidence reasonably supports that decision, as undoubtedly is the case here, I think it has, under the Davis Amendment, not only the right and power to grant the application, but that the plain and explicit language of the amendment requires it to do so, for in no other way can the equalization which Congress has declared should obtain be accomplished. In such a case, if injury results to the holder of a revocable permit, the injury is said to be damnum absque injuria.

Since Congress possesses the power, the right to assert it may not be questioned, nor the motives which impel it inquired into, nor its wisdom challenged. It is for the courts to follow the law as they find it. Hamilton v. Distilleries Co., 251 U. S. 146, 161, 40 S. Ct. 106, 64 L. Ed. 194.

If Congress should hereafter think that the progress of the science and the stability of investments made in its development will be better advanced and the public interest benefited by modification or reversal of the policy inducing the passage of the amendment, a repeal or modification will avoid such a situation as exists here, but that, unfortunately for appellants, is not now the case.

I am not unmindful of the fact that the effect of this is to impose upon the Commission great responsibility and wide powers affecting large investments in property, and likewise discretion in the ascertainment of the "public interest" without explicit standards or formulæ. But as to this we can only say that the Supreme Court has several times approved standards no more definite in cases where, as here, the delegation was to executive boards or officers. See Mahler v. Eby, 264 U. S. 32, 41, 44 S. Ct. 283, 68 L. Ed. 549; Colorado v. United States, 271 U. S. 153, 169, 46 S. Ct. 452, 70 L. Ed. 878; Mutual Film Corp. v. Industrial Com., 236 U. S. 230, 245, 35 S. Ct. 387, 59 L. Ed. 552, Ann. Cas. 1916A, 296. Besides, the Radio Act requires certain definite information from those applying for permits, and this and the evidence of comparative benefits developed at the hearings furnish a reasonable basis for applying the statutory standard as nearly free from unjust discrimination as is possible. Here the Commission has assigned definite reasons for its refusal to renew appellants' licenses on the one hand and the transfer of their facilities to intervener on the other. These, as we have seen, show that the action taken would supply an existing need to the people in Indiana without corresponding loss to the people of Illinois and would carry out the congressional will. This, I think, is enough.

Judge HITZ authorizes me to say that he concurs in this dissent.