## The Baltimore and Ohio Railroad Company vs. Matilda Chase, and others.

*Riparian Rights—Right under the Act of 1745, ch. 9, of the Owner of a Lot fronting on the Water, to extend out and make Improvements in Front of his Lot, to the limit prescribed by the Authorities of the City— Where the right to Improve provided by the Act of 1745, ch. 9, and confirmed by the Act of 1784, ch. 39, has become Vested by a Grant from the State, it is not competent to the State by a subsequent Grant or conveyance to Impair such right—Act of 1854, ch. 164.*

By the common law, where land lies adjacent or contiguous to a navigable river, in which there is an ebb and flow of the tide, any increase of soil formed by the gradual and imperceptible recession of the waters, or any gain by the gradual and imperceptible formation of what is call alluvion, from the action of the water washing it against the fast land of the shore, and there becoming fixed as part of the land itself, belongs to the proprietor of the adjacent or contiguous land. And the right to accretion, thus formed, is considered as an interest appurtenant to the principal land, and belonging, in the nature of an incident, to the ownership of that, rather than as something acquired by prescription or possession, in the ordinary legal sense of those terms.

Balt. & Ohio R. R. Co. *vs.* Chase, *et al.*

And in addition to this right by reliction or accretion, the riparian proprietor, whose land is bounded by a navigable river, whether his title extended beyond the dry land or not, has the right of access to the navigable part of the river from the front of his lot, and the right to make a landing, wharf or pier for his own use, or for the use of the public, subject to such general rules and regulations as the Legislature may think proper to prescribe for the protection of the rights of the public, whatever those rights may be.

These riparian rights, founded on the common law, are property, and are valuable, and while they must be enjoyed in due subjection to the rights of the public, they cannot be arbitrarily or capriciously destroyed or impaired. They are rights of which, when once vested, the owner can only be deprived in accordance with the law of the land, and, if necessary that they be taken for public use, upon due compensation. .

But these principles of the common law, governing the rights of the riparian owner, are subject to change and modification by the statute law of the State, and by the nature and circumstances of the grant by which the title may have been acquired to the land bounding on the river. .

Under the Act of 1745, ch. 9, the right of a lot owner, fronting on the water, to extend his lot, or improve out, to the limit prescribed by the authorities of the city, is a franchise,—a vested right, of which the lot owner cannot be lawfully deprived without his consent. And if any other person, without his authority, make such extension, no interest or estate in the improvement vests in the improver, but it becomes the property and estate of the owner of the franchise. But this right of the owner to improve out is confined to the *front* of his lot, and must be within the side or outlines of the lot extended to the Port-warden's line.

In · 1795, J. T. C. under whom the plaintiffs claimed, became the purchaser of lot No. 27, part of the confiscated property of the Principio Company, situate on what was then called Whetstone Point, on the Patapsco River, and received a deed therefor. Lots Nos. 20 and 21, on the north-east of lot No. 27, were conveyed by the State in 1781, and title to those two lots, Nos. 20 and 21, and also to lots Nos. 28 and 29, on the south-east of lot No. 27, by regular conveyances became vested in the defendants. All these lots, bounded and fronted on the Patapsco River, a public, tidal, navigable stream, a portion of which within the limits of the city, formed the port of Baltimore. By the Act of 1745, ch. 9, sec. 10, it was provided that "all improvements, of what kind soever, either wharves, houses, or other buildings, that have been or shall be, made out of the water, or where it usually flows, shall (*as an encouragement to such improvers,*) be forever deemed the right, title and inheritance of such improvers, their heirs and assigns for-

ever.'' Under this Act, neither the plaintiffs nor those under whom they claimed, ever attempted to improve the water front of lot No. 27; but the owners of lots Nos. 20 and 21, and of lots Nos. 28 and 29, availing themselves of the provision of the Act of 1745, and by the permission of the city authorities, improved in front of those lots by filling up and extending them out a considerable distance from the original shore line of the river, and the erection of costly and permanent wharves, and other structures, to the convenience of commerce, and the accommodation of the largest vessels that entered the port. By reason of the angular formation of the original shore line of the river, the direct frontal extension of the lines of the lots Nos. 20 and 21, was eastwardly, while a simular extension of the lines of lot No. 27, would be in a northerly direction; and consequently there would be a conflict of the lines of extension at nearly right angles. Lots Nos. 20 and 21, extended eastwardly, cut off lot No. 27, from the water altogether. The extent of the original shore line or water front of lot No. 27, was seventy-two and a half feet, and the improvements northward of this original water line, made by the defendants, or those under whom they claimed, prevented the use, by the owners of lot No. 27 of such water front, or any water front of that lot whatever, it being admitted that so much of the space between the western line of lot No. 28, extended northerly to the front of the wharf shown on the plat and lots Nos. 20 and 21, as was sufficient to cut off lot No. 27, from the water, was filled in and made solid ground by a former owner of lots Nos. 20 and 21, and before the defendants took possession thereof. An action of ejectment was brought by the plaintiffs to recover of the defendants the made ground and the improvements that existed within the space embraced by the prolongation of the eastern outline of lot No. 27, and a line drawn in the same direction from the western end of the original water line or front of seventy-two and a half feet, to the Port-warden's line, as at present laid out in front of said lot. HELD:

1st. That the plaintiffs were not entitled to recover; that the right of improvement provided by the Act of 1745, ch. 9, and confirmed by the Act of 1784, ch. 39, passed as incident to the land conveyed by the first grant from the State in 1781, and being a valuable right, and having become vested, no right or franchise inconsistent therewith could pass by the subsequent grant in 1795; the latter being construed with reference to the rights conveyed to the former.

2nd. That whatever may have been the object of the Act of 1854, ch. 164, in declaring what were the true intent, meaning and effect of the several deeds from the Chancellor of the State to the purchasers of several of the lots of the confiscated property, on Whetstone Point, including lot No. 27, the Legislature had no power to divest or impair any vested rights under the

prior grants of the State; and nothing in the Act could affect the rights of the proprietors of lots Nos. 20 and 21, to which the Act made no reference.

APPEAL from the Baltimore City Court.

This was an action of ejectment brought by the appellees against the appellant. The plaintiffs, assuming that they were entitled to a portion of the accretion in front of their lot, No. 27, and the water, advanced five different methods of laying out the same. They first proposed that a straight line should be drawn from the extremities of the old shore line, and straight lines should be drawn perpendicularly to this line from the termini of the original water front of lot No. 27, and that these perpendicular lines should be thence extended until they reached the water. This plan is designated on the plat as 1. The second plan was to draw lines perpendicularly from the termini of the old water front of lot No. 27, to the Portwarden's line as it existed when the suit was brought. This plan is marked 2 on the plat. The third and fourth plans proceeded upon the supposition that lot No. 27, was not entitled to representation on the new water line for the full extent of its old water line, but only for so much as was unobstructed by the promontory marked Z. Treating lines C. B. as the water front, plan No. 3, proposed perpendicular lines to the Port-warden's line as it formerly existed, and from that perpendicular line to the present Port-warden's line—this is the plan marked 3. The fourth plan represents the lines as continued from the former Port-warden's line to the present Port-warden's line, without any change of direction. This plan is marked 4 on the plat. The fifth plan was to treat the present Port-warden's line as the shore line and to draw lines from the termini of the original water line of lot No. 27, to intersect the Port-warden's line at such points as would leave a proper proportion of the water front on that line to the east and west, to represent the old water front of the

lots to the east and west of lot No. 27. This plan is desig-
nated on the plat by the number 5. The following plat
will greatly assist the understanding of the case as stated
in the opinion of the Court, as also of the theories of the
appellees in respect of the accretion in front of their lot:

The cause was argued before BARTOL, C. J., STEWART, BOWIE, GRASON, ALVEY and ROBINSON, J.

*John K. Cowen* and *John H. B. Latrobe*, for the appellant.

The State being the owner of lands under navigable water, has granted the same to the owners of lots fronting on the water, on condition of improvement.

The direction in which improvements are to be made from the shore, has not been accurately determined. But the universal practice in the harbor of Baltimore, has been to extend the lots by right lines, and this practice has been sanctioned by judicial decision. In the present case, by reason of the curvature of the shore, there is a conflict between the adjoining owners; and as there is no provision of law to avoid such a conflict, lots Nos. 20 and 21 being held under the elder title, coupled with the fact that the owners of those lots have improved, have the paramount right of extension. See *Dugan, et al. vs. Mayor, &c. of Baltimore,* 5 *G. & J.*, 367, 373; *Baltimore vs. McKim*, 3 *Bland*, 454, 455, 466, 467; *Casey vs. Inloes*, 1 *Gill*, 510; *Wilson vs. Inloes*, 11 *G. & J.*, 361.

The "alluvial" theory of the plaintiffs, or the mode adopted by the Court are impracticable. They both are furnished upon the fallacy that the object of a Portwarden's line is to determine the boundaries between the riparian owners, by determining the *direction* of improvement, whereas the only purpose of such a line is to determine the *extent* not the *direction*, of any improvement made—it protects the *public* right of navigation, but does not settle disputed claims among shore proprietors.

The defendant, by its charter, can take possession of land before condemnation; and as the defendant is entitled to possession, there can be no recovery in this action of ejectment. The defendant has entered upon, is using and occupying the premises for the purposes of its tracks, and

for its warehouses and other works necessary to its road. The plaintiffs' remedy is in equity by a bill asking a mandamus to compel the company to have an inquisition of damages, or an injunction until the company take proper proceedings to ascertain the value. See *Act of* 1826, *ch.* 123, *secs.* 14, 15, 17; *Compton vs. Susquehanna R. R.*, 3 *Bland,* 386; *Mayor, &c. of Pittsburgh vs. Scott,* 1 *Penn.*, 309; *Davis vs. Russell,* 47 *Maine,* 443; *Bloodgood vs. M. & H. R. R. Co.*, 14 *Wend.*, 51.

But even if the Railroad Company did not have by its charter the right of entry and use prior to condemnation; yet after it has entered and built upon the ground, the landholder who stands by and sees these things going on, cannot *reclaim the land* in ejectment, nor *enjoin its use.* His only remedy is by a proceeding to obtain *its value. Goodin vs. C. & W. Canal Co.*, 18 *Ohio St.*, 169; *McAulay vs. Western Vt. R. R. Co.*, 33 *Vt.*, 311—*especially* 320-321; *Wendell vs Van Rensselaer,* 1 *Johns. Ch.*, 352-353, *and cases there cited; Adams vs. Rockwell,* 16 *Wend.*, 285.

In no event can the plaintiffs' lines, under the Court's instruction, go beyond the navigable water on the Port-warden's line of 1833. The instruction proceeds upon the theory, that the entire space between the Port-warden's line and the shore may be filled. But this cannot be, otherwise in many instances there would be the cutting off of water fronts of the various lot owners. Lot No. 27 is only entitled to go to navigable water; is not entitled to the land under it, as is given by the Court.

The building of the bulk-heads and their continued exclusive use, under claim of right, as the water front privilege of lots Nos. 28 and 29, is an *adverse* possession—not only of the *land* covered by the bulk-heads or wharves—but also, of all lying between them and the shore line of Nos. 28 and 29. And although the filling in of the intervening space might not have all been completed twenty years prior to the time of commencing the

suit, yet the erection of the bulk-heads twenty years prior thereto, under claim of right so to do, as the water front privilege of lots Nos. 28 and 29, and their continued exclusive use by the owners of those lots ever since, was a possession adverse, of the whole space covered with water, between the ancient shore of said lots, and the bulk-heads. What is meant by "*adverse*" in any case? Simply a claim of right inconsistent with the claims and rights of others. What can be adverse possession of a water front? Such a use of the water front claimed to belong to certain lots as is ordinary, and which cuts off an adjoining lot-owner from going *in that direction* to the water.

If McKim, as owner of lots Nos. 28 and 29, built the bulk-heads as appurtenances to those lots, surely right of access to the bulk-heads from the lots, goes as part of the adverse claim. How could lot No. 27 claim to go *towards* the bulk-head? Only to get to the water. But the bulk-head stops them from going to the water. Therefore the erection of the bulk-head is adverse to the claim to go in that direction at all, and the possession and use of the bulk-heads would be a possession and use of the entire space to the old shore.

This is true, even *technically*, because every pile that is driven, and every load of earth that is thrown into the bulk-head, changes the condition of the water between that and the shore.

*Skipwith Wilmer* and *Randolph Barton*, for the appellees, contended:

1st. That by the deed of the 1st of January, 1795, from the State of Maryland to the ancestor of the appellees lot No. 27, therein described, was conveyed with a water front of seventy-two feet, six inches, (the extent is conceded) the water in front of which they were to enjoy in common with the owners of lots Nos. 20 and 21; and that the rights thereto, existing between said three lots were reciprocal,

and were to be enjoyed by all subject to corresponding rights in each other.   And that this right could only be divested by voluntary conveyance, or by the Act of Limitations—and that their right has not been lost by either of these means.

2nd. That the appellees were under no compulsion to improve their property—and that by failing to make improvement, no rights are lost, but their original claim to a water front is unimpaired, except so far as a change made by natural causes (accretion, &c.,) may have reduced it in extent.   And that the appellant cannot rely upon its "spirit of enterprise" to justify it in appropriating private property to its own uses without consideration.

3rd. That natural causes, viz : accretions to the original shore line in front of all of the lots on the north-eastern side of Whetstone Point, from Fort McHenry northwardly to Locust Point, (at the foot of Hull Street, said street being the old road leading from Locust Point to Fort Avenue) and the consequent shortening of the present shore line as compared to the original shore line, necessitate a proportionate decrease in the water fronts of the several lots lying on the water between the points thus indicated—and that this decrease is in accordance with the principle of an equitable division of the new land thus formed in front of the various lots.

The termination of Hull Street on the north, at the water, and at Martin Street on the south, at the water, (this being the line of the United States property at Fort McHenry,) are the points to be considered, between which the accretions are to be divided, so far as the rights of riparian owners between those points are to be ascertained.

The plat and copies of the city map filed in the cause, show that these two points represent practically unchangeable objects of nature, and in a curving shore, containing indentations and promontories, the general line between decided projections is to be selected for the por-

pose of ascertaining the rights of intervening riparian owners. *Deerfield vs. Ames,* 17 *Pick.,* 42; *Jones vs. Johnston,* 18 *Howard,* 150; *Johnston vs. Jones,* 1 *Black,* 223; *O'Donnell vs. Kelsey,* 10 *N. Y.,* 414.

ALVEY, J., delivered the opinion of the Court.

The property in controversy in this case is situate on the Patapsco river, and within the limits of the city of Baltimore, at what is now called Locust Point, the eastern terminus of the Baltimore and Ohio Railroad.

By the Acts of 1780, chapter 45, and 1781, chapter 37, commonly known as the confiscation Acts, the real estate of the Principio Company, situate on what was then called Whetstone Point, on the Patapsco river, was seised and confiscated by the State, as property belonging to British subjects, and which estate, with certain exceptions and reservations, was divided into lots and sold by commissioners appointed by the State. The lots were designated by numbers on an official plat; and of lot No. 27, Judge Jeremiah Townley Chase, under whom the plaintiffs claim, became the purchaser, and received a deed therefor in 1795. Lots Nos. 20 and 21, on the north-east of lot No. 27, were conveyed by the authority of the State in 1781; and title to these two lots, Nos. 20 and 21, and also to lots Nos. 28, 29, &c., on the south-east of lot No. 27, has, by regular conveyances, become vested in the defendants. All these lots, the numbers of which have been mentioned, bounded and fronted on the river, which is a public, tidal, navigable stream, that portion of which that is within the limits of the city, forming the port of Baltimore.

By the Act of 1745, chapter 9, sec. 10, which was a supplement to the Act incorporating Baltimore Town, it was provided that "All improvements of what kindsoever, either wharves, houses, or other buildings that have been or shall be made out of the water, or where it usually

flows, (*as an encouragement for such improvers,*) shall be forever deemed the right, title and inheritance of such improvers, their heirs and assigns forever ''

Under this Act, neither the plaintiffs nor those under whom they claim, have ever attempted to improve the water front of lot No. 27 ; but the owners of lots Nos. 20 and 21, and of lots Nos. 28 and 29, availing themselves of the provision of the Act of 1745, and by the permission of the city authorities, have improved in front of those lots, by filling up and extending them out a considerable distance from the original shore line of the river, and the erection of costly and permanent wharves, and other structures, for the convenience of commerce, and the accommodation of the largest vessels that enter the port.

By reason of the angular formation of the original shore line of the river, the direct frontal extension of the lines of lots Nos. 20 and 21 is eastwardly, while a similar extension of the lines of lot No. 27, would be in a northerly direction ; and consequently there would be a conflict of the lines of extension at nearly right angles; and it is admitted that lots Nos. 20 and 21, extended eastwardly, cut off lot No 27 from the water altogether. It is also admitted that the extent of the original shore line or water front of lot No. 27 was seventy-two and a half feet, and that the improvements northward of this original water line, made by the defendants, or those under whom they claim, prevent the use, by the owners of lot No. 27, of such water front, or any water front of that lot whatever, it being also admitted that so much of the space between the western line of lot No. 28, extended northerly to the front of the wharf shown on the plat, and lots Nos. 20 and 21, as was sufficient to cut off lot No. 27 from the water, was filled in and made solid ground by a former owner of lots Nos. 20 and 21, and before the defendants took possession thereof. And such being the relative situation of these lots, the present action of ejectment is

brought by the plaintiffs to recover of the defendants the made ground and the improvements that exist within the space embraced by the prolongation of the eastern outline of lot No. 27, and a line drawn in the same direction from the western end of the original water line or front, of seventy-two and a half feet, to the Port-warden's line, as at present laid out in front of said lot.

In the trial below, the Court determined, from the admissions of the parties and the exhibition of plats, that the plaintiffs were only entitled to thirty-five feet of water front, that being the distance from the eastern line of lot No. 27 to the tangent, as shewn by the plat, to the most eastern point of lot No. 20, and that the plaintiffs were entitled to recover the land and improvements included within lines drawn from the ends of the thirty-five feet water front so as to intersect at right angles the Port-warden's line of 1833, and thence extended, the distance of thirty-five feet apart, so as to connect with, at right angles, and bind on the present Port-warden's line ; thus assimilating the present Port-warden's line to the thread of the stream.

From this instruction, it would appear that the Court below regard the plaintiffs as being entitled as riparian owners to all the made land and improvements within the limits described, and that such land and improvements are recoverable upon the same principle that relicted land, or land formed by accretion from natural causes, may be recovered by the riparian owner, whose principal land has been thus extended.

By the common law it is well settled, that where land lies adjacent or contiguous to a navigable river, in which there is an ebb and flow of the tide, any increase of soil formed by the *gradual and imperceptible recession* of the waters, or any gain by the *gradual and imperceptible formation* of what is called alluvion, from the action of the water in washing it against the fast land of the shore,

and there becoming fixed as part of the land itself, shall belong to the proprietor of the adjacent or contiguous land.  2 *Blk. Com.*, 261; *Giraud's Lessee vs. Hughes*, 1 *Gill & John.*, 249.  And the right to accretion, thus formed, is considered as an interest appurtenant to the principal land, and belonging, in the nature of an incident, to the ownership of that, rather than as something acquired by prescription or possession, in the ordinary legal sense of those terms.  3 *Washb. on Real Pro.*, 59. And in addition to this right by reliction or accretion, the riparian proprietor, whose land is bounded by a navigable river, whether his title extends beyond the dry land or not, has the right of access to the navigable part of the river from the front of his lot, and the right to make a landing, wharf or pier for his own use, or for the use of the public, subject to such general rules and regulations as the Legislature may think proper to prescribe for the protection of the rights of the public, whatever those rights may be.  This is well established doctrine by both Federal and State Courts.  *Dutton vs. Strong*, 1 *Black*, 25; *The Railroad Co. vs. Schurmeir*, 7 *Wall.*, 272; *Yates vs. Milwaukee*, 10 *Wall.*, 497; *East Haven vs. Hemingway*, 7 *Conn.*, 186; *Sherlock vs. Bainbridge*, 41 *Ind.*, 35.

These riparian rights, founded on the common law, are property, and are valuable, and while they must be enjoyed in due subjection to the rights of the public, they cannot be arbitrarily or capriciously destroyed or impaired. They are rights of which, when once vested, the owner can only be deprived in accordance with the law of the land, and, if necessary that they be taken for public use, upon due compensation.  *Yates vs. Milwaukee*, 10 *Wall.*, 504.  It is in view of these principles that the present action is sought to be maintained.  But these principles of the common law, governing the rights of the riparian owner, however well established, are subject to change and modification by the statute law of the State, and by

the nature and circumstances of the grant by which the title may have been acquired to the land bounding on the river.

As we have seen, the Act of 1745, chapter 9, sec. 10, was intended to encourage improvements on the water fronts of the harbor of Baltimore, for the convenience and accommodation of commerce; and as an inducement, the State agreed with, and did thereby surrender to, those improving as contemplated by the Act, all its right as sovereign in the shore of the river, covered by such improvements, below the ordinary water-mark, and declared that such improvements should be forever deemed the right, title and inheritance of such improvers, their heirs and assigns forever.

By the construction of this Act, as settled by the decisions of our predecessors, the right of the lot owner, fronting on the water, to extend his lot, or improve out, to the limit prescribed by the authorities of the city, is a franchise,—a vested right peculiar in its nature, but a *quasi* property, of which the lot owner cannot be lawfully deprived without his consent. And if any other person, without his authority, make such extension, no interest or estate in the improvement vests in the improver, but it becomes the property and estate of the owner of the franchise. *Casey's Lessee vs. Inloes,* 1 *Gill,* 510. But this right of the owner to improve out, is confined to the *front* of his lot, and must be within the side or outlines of the lot extended to the Port-warden's line. In the case of *Dugan vs. The Mayor and City Council of Balto.,* 5 *Gill & John.,* 367, the Court held, that the Act of 1745, vested in the improver no title to improvements not made in accordance with the provisions of that Act; and that "the improvements, authorized and encouraged, were those made by improvers *in front of their own lots,* not of their neighbors. The Legislature never designed such an invasion of the rights of private property; nor, indeed,

had they the power to legalize it, if such had been their design." 1 *Gill*, 501.

Now, in this case, as the supposed right of extension and improvement of lot No. 27, never yet attempted to be exercised, would be in conflict with the right and actual extension and improvement of lots Nos. 20 and 21, the extension of the former lot necessarily covering a space already occupied by the extension and improvement of the fronts of the latter lots, within their proper lines, the question is, what are the rights of the parties in respect of such conflict?

This question is of easy solution; and, indeed, it has been virtually answered by this Court, in deciding a similar question on a former occasion.

As we have already seen, the title to lots Nos. 20 and 21, was conveyed by the authority of the State in 1781, while the title to lot No. 27, owned by the plaintiffs, was conveyed by the same authority in 1795. At the time of these grants from the State, the improvement Act of 1745, was in full force and operation, and of course, the franchise, or right of improvement, as provided by that Act, and saved and confirmed by the Act of 1784, chapter 39, passed as incident to the land conveyed by the first grant from the State; and such right being valuable, and having become vested, it was not competent to the State, by subsequent grant or conveyance, to derogate from or impair the right previously granted. The right of improvement, under the Act of 1745, passed by legal operation and intendment of the first grant, and no right or franchise inconsistent therewith could pass by the subsequent grant; the latter being construed with reference to the rights conveyed by the former. This is the general principle applicable in cases of conflicts under grants by the State, and it has been expressly decided to be applicable in a case of conflicting claims to improve under the Act of 1745.

The case to which we refer, is that of *Wilson vs. Inloes*, 11 *Gill & John.*, 351. In that case it was held, that the improvements authorized by the Act of 1745, chapter 9, sec. 10, were those made by improvers in front of their own lots, not of their neighbors, and the right of improvement in cases of conflicts between riparian proprietors, arising from the curvature of the shore of the river, is vested in the elder patentee, and those claiming under him, and is not divested or in any manner impaired by a subsequent grant by the State. The Court, in speaking of the conflicting rights insisted on by the parties, derived under grants from the State, said: "But it has been strongly argued in this case, that both plaintiff and defendants are riparian proprietors, and that as no provision has been made by law for such a conflict of rights, neither party can claim title to the prejudice or exclusion of the other. But we think, as we have before remarked, that the right vested in the prior grantee under the Act of 1745, and confirmed by that of 1784, is paramount to, and must prevail over, that of the junior grantee, and that the improvement made by the corporation under the Ordinance of 1823, must enure to the benefit of those, who claim title under the senior grant." That case would seem to be entirely conclusive of the present.

But our attention has been called to the Act of 1854, chapter 164, wherein there is a legislative declaration of what is said to be the true intent, meaning and effect of the several deeds from the Chancellor of the State, to the purchasers of several of the lots of the confiscated property on Whetstone Point, including lot No. 27. It is enough, however, to say of this Act, that the Legislature was powerless to divest or impair any vested rights under the prior grants of the State; and whatever may have been the object in making such a declaration, as we find in the Act of 1854, whether to extend and enlarge existing rights, or to fix and render certain a doubtful construction,

in either case, it is perfectly clear that nothing in that Act can affect the rights of the proprietors of lots Nos. 20 and 21, to which the Act makes no reference whatever.

Entertaining the views expressed, we are of opinion that there was error committed by the Court below in the instruction granted by it, under which the verdict was found for the plaintiffs, and that consequently the judgment appealed from must be reversed ; and as it is apparent that there can be no recovery by the plaintiffs, the reversal will be without the award of a new trial.

*Judgment reversed.*

(Decided 11th June, 1875.)

ROBINSON, J., dissented.