LUNTER, ET UX *v.* LAUDEMAN

[No. 332, September Term, 1967.]

*Decided October 15, 1968.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*William P. Hepburn* for appellants.

*James D. Laudeman, Jr.* and *Allan C. Wescott* for appellee.

Amicus curiae brief filed by Mayor and Aldermen of City of Annapolis. *George B. Woelfel, Jr.* on the brief.

BARNES, J., delivered the opinion of the Court.

The principal questions in this case involve the scope of an appeal to the Mayor and Aldermen of the City of Annapolis (the City) from a decision of the Port Wardens of the City under Section 40 of the Charter of the City, and the sufficiency of the evidence presented to support the decision reached by them on such appeal.

James D. Laudeman, Jr., the appellee, (Laudeman) has legal title to a lot in the City of Annapolis which fronts on Weems Creek on the west side of the foot of Tucker Street, between Tucker Street and Annapolis Street. It contains 1.31 acres and is improved by a dwelling house which fronts on the west side of Tucker Street. The Weems Creek frontage was originally 159.36 feet at the natural shore line. When the concrete bulkhead which the evidence showed was in the process of construction is completed, the Weems Creek frontage will be 184.82 feet.[1] The lot is zoned Residential C.

On June 30, 1966, Laudeman filed an application with the Port Wardens to erect a pier 6 feet wide and 90 feet long, with mooring piles, extending into Weems Creek in a northwesterly direction at right angles to a portion of the concrete bulkhead.

At the hearing before the Port Wardens on July 14, 1966, Laudeman, who resides at Glyndon, in Baltimore County, testified that there were three other persons who had an interest with him in the lot, Messrs. Frey, Forbes and Gavin, all of whom had sailboats, as he did, 35 feet in length. He made it clear that there was no intention to make the property or the proposed pier into a commercial marina, but that the 90 foot pier was needed so that he, his associates and the tenant on the property would have sufficient depth of water for their boats which draw approximately five feet of water. He also indicated that he and his associates were seeking to improve the appearance of the property and in doing this, would add to the attractiveness of the neighborhood. There was testimony before the Port Wardens that the pier would have 11 or 12 slips for boats. There were several neighboring property owners who objected to the granting of the license (or permit) to Laudeman. After consideration, the Port Wardens, by a unanimous decision, approved a 62 foot pier with four permanent slips. Laudeman did not appeal this decision by the Port Wardens pursuant to Section 40 of the Charter, but the protesting neighboring property owners did appeal to the Mayor and Aldermen of Annapolis.

---

1. The original acreage was 1.19 acres. The bulkhead improvement added .12 acres, a total of 1.31 acres.

Sections 36 and 37 of the Charter of the City provide for the appointment of not less than three nor more than five persons by the Mayor and Aldermen as Wardens of the port of the City. These Port Wardens are removable at the pleasure of the Mayor and Aldermen and take a prescribed oath that they "will discharge the trust of warden[s] of the port of the City of Annapolis to the best of my ability, without favor, affection or partiality." Under Section 36, these Port Wardens were duly appointed and qualified. One of them is William R. Jackson, the City Engineer.

Sections 38, 39 and 40 of the Charter are the important sections for this case and are as follows:

Sec. 38 (Port Wardens) Powers generally.

"The wardens, or a majority of them, *shall have power to determine upon and regulate all matters relating to the erection or building of wharves in the said port, so far as respects the distance said wharves may be extended into the water, and the materials of which they shall be constructed, and the manner and form of construction,* always keeping in view the preservation of the navigation of said port by not permitting any wharf to be carried out in such manner as to render the *navigation* of the same *too close and confined,* or to be built of such *materials* or *constructed* in such manner *as may be deemed not sufficiently substantial and lasting."*

Sec. 39. Same—License to build wharf, etc.

"*No person* holding lands on the waters of said port, nor any person whatever, *shall build any wharf,* or carry out any earth or other material for that purpose *without license from said wardens,* or a majority of them, to do the same; and if any persons shall offend against the provisions of this section, or if any person shall build any wharf a greater distance into the waters of said port, or in a different form, or of different materials than determined and allowed by the wardens, or a majority of them, he shall be subject to such fine as the mayor and aldermen may ordain."

Sec. 40. Same—Appeals to mayor and aldermen.

"In *all differences that shall arise* between any citizen of Annapolis and the said wardens, *touching the discharge of their duty, an appeal shall lie to the mayor and aldermen.*" (Emphasis supplied.)

Two hearings on the appeal took place before the Mayor and Aldermen. One was held on August 29, 1966, at 8:00 p.m., at which extensive evidence was taken and arguments presented. The other hearing was held on September 12, 1966, at 8:00 p.m., and was, in effect, a continuation of the first hearing. The vote of the Mayor and Aldermen was taken upon a motion to reduce the length of the pier to 55 feet with no more than two permanent slips. The motion was passed unanimously.

Laudeman, thereafter on October 13, 1966, filed a bill of complaint in the Circuit Court for Anne Arundel County praying for a declaration that the action of the Mayor and Aldermen in reducing the length of the pier and the number of slips be declared to be arbitrary, capricious, unreasonable, illegal, null and void and in excess of the power granted by Sections 36 through 40 of the Charter, for a mandatory injunction directing the Mayor and Aldermen and the Port Wardens to issue the permit for a 62 foot pier without restriction as to the number of permanent slips and for other relief. The appellants, Frank Lunter and Evelyn Lunter, his wife, nearby property owners, were permitted by the Chancellor to intervene as parties defendant. After answers were filed and a hearing was held, the Chancellor (Sachse, J.) filed a well considered opinion indicating that the action of the Mayor and Aldermen was null and void and the action of the Port Wardens was proper. On September 27, 1966, the Chancellor passed a final decree in accordance with his opinion, directing that the license for the 62 foot pier with four permanent slips be issued by the Port Wardens and requiring the costs to be paid one-half by Laudeman and one-half by the intervening defendants. Mr. and Mrs. Lunter took a timely appeal to this Court from this decree. Laudeman took no cross appeal.

In our opinion (1) the Mayor and Aldermen were confined to a review of the decision of the Port Wardens within the scope

of the powers granted to the Port Wardens by Section 38 of the Charter and (2) there was no legally sufficient evidence to support the action of the Mayor and Aldermen in reducing the length of the pier and the number of slips. The Chancellor's decree will be affirmed.

### (1)

Section 38 of the Charter of the City confers power on the Port Wardens *to determine upon and regulate all matters* (1) relating to the *erection or building of wharves* in the port; (2) the *distance* the wharves *extend into the water*; and (3) the *materials* of which the wharves are constructed and the *manner* and *form* of such construction. All of these powers are subject to the overriding purpose of the grant of power, i.e., keeping in view (a) the preservation of the navigation of the port by not permitting any wharf to render navigation *too close and confined* or (b) to be built of such materials and constructed in such a manner as will be deemed *not sufficiently substantial and lasting*. This is the scope of the grant of power by the General Assembly to the Port Wardens.

In Section 29 of the Charter, granting general powers to the Mayor and Aldermen, power is given to "enact all laws and ordinances necessary to preserve the health of the city; * * * to provide for the appointment, and define the duties of city commissioner, police officers * * * *harbor masters* * * * and all other officers whom they may create, and to define their duties and compensation; * * * to cause a survey * * * of the city, its harbor, streets * * * to be made; * * * to declare and adjudge as nuisances any encroachments on the streets, lanes and alleys, and cause the same to be removed at the expense of the person offending; * * * and generally for promoting and securing the good government of the city." (Emphasis supplied.) There is no general grant of powers in regard to the Port Wardens, whose powers and duties are governed by Sections 36 to 40 of the Charter.[2]

Section 40 grants the right of appeal from the decisions of the Port Wardens to the Mayor and Aldermen. The language

---

2. Curiously there is no general grant of the entire police power of the State as was done, with one reservation, in the Baltimore City Charter. Cf. Sec. 6 (24) of the Baltimore City Charter (1949).

of this somewhat unusual provision in regard to an appeal is of importance in this case. The scope of the appeal is set forth in Section 40 where it provides "In *all differences* that shall arise between any citizen of Annapolis and the said wardens, *touching the discharge of their duty,* an appeal shall lie to the Mayor and Aldermen." (Emphasis supplied.) This language limits the appeal to the duties imposed upon the Port Wardens by Section 38, which, as we have indicated, are three in number subject to two overriding purposes. There is no attempt by Sections 36 to 40 to invest the Port Wardens with the exercise of any portion of the police powers other than that specifically granted and this would appear to be a logical arrangement, as the exercise of other portions of the police power is granted to other officials specially qualified to exercise those other powers, as we shall point out.

The Port Wardens do not have any power to enforce or construe any applicable zoning laws or regulations. These zoning ordinances appear in Chapter 26 of the Code of the City and have an entire and complete system of enforcement entirely apart from any power exercised by the Port Wardens. Appeals under the zoning ordinances of the City must be taken to the Board of Appeals as provided for in Sections 26-38 and 26-39 of the Code. This Board of Appeals was created pursuant to a specific grant of legislative power by the General Assembly in the Act of 1933, Chapter 599 (Code (1957), Art. 66B, Secs. 10-37). Section 26-38(a) of the City Code recites that the Board of Appeals is created in accordance with that Act. We, and our predecessors, have held that the zoning powers of municipal corporations are derived from the State Enabling Acts and not from any general grant of the State's police power to municipal corporations. See *Gino's, Inc. v. Mayor and City Council of Baltimore,* 250 Md. 621, 630-31, 244 A. 2d 218, 223-24 (1968) and Maryland cases cited therein.

The enforcement of the police powers in regard to health is provided for in Chapter 14 of the Code of the City. This enforcement power is given to the health officers and no part of that power is given to the Port Wardens.

It is apparent to us that the provisions of the Charter clearly define the scope of the powers and duties of the Port Wardens

and thus confine such powers and duties to those set forth. They were not intended to include the exercise by the Port Wardens of any other police powers of the City. Section 40, effectively, by its terms, confines the scope of the appeal to the Mayor and Aldermen to "differences * * * touching the discharge of their duty" and the Mayor and Aldermen may not lawfully go beyond that scope of appeal. We do not reach or decide whether by appropriate charter amendment or otherwise, the scope of appeal could be broadened.

Our construction of Sections 38 and 40 of the Charter is fortified by a consideration of the legislative history of these sections.

Sections 38 and 40 as well as Sections 36, 37 and 39 were first passed by the General Assembly by the Act of 1785, Chapter 26. The language of Section III of the Act of 1785 is identical in all relevant respects to the present language of Section 38 as is the language of Section VIII of that Act with the present language of Section 40.[3]

The Act of 1785, Chapter 26 contains the following preamble:

> "Whereas the dispatch and ease of vessels in taking and discharging their lading depends to a considerable degree upon the convenience afforded by proper wharfs; And Whereas certain rules and regulations are necessary to enable the citizens of Annapolis to erect wharfs for the convenience of trade in such manner as not to prejudice the navigation of said port, either by extending too far upon the channel of the river, or by erecting wharfs in such places of said port, or in such manner, as may be deemed improper and prejudicial."

---

3. This language was continued in the Code of Public Local Laws of 1860, Art. 2, §§ 49-54 and in the Code of Public Local Laws of 1888, Art. 2, §§ 41-45. The Codes of Public Local Laws of both 1860 and of 1888 superseded and were enacted in lieu of all prior laws of the State. See the Act of 1860, passed January 12, 1860 and the Act of 1888, Chapter 74. The language was continued in the Charter in the City Code of 1914, and, as indicated, in the Charter in the present City Code of 1960.

Then follows the enactment of Sections II through IX of the Act of 1785.

The General Assembly by the Act of 1745, Chapter 9 had provided that improvements (including wharves) in waters in front of their land should "be forever deemed the right, title and inheritance of such improvers, their heirs and assigns forever." See *Causey v. Gray,* 250 Md. 380, 387-90, 243 A. 2d 575, 581-83 (1968) for a review of this and subsequent legislation. We stated in the opinion in that case:

> "The owner of the fast land, however, has a common law right to land formed by accretion adjacent to the fast land and has the right of access to the navigable part of the river in front of his fast land, with the right to make a landing, wharf or pier in front of his fast land, subject, however, to general rules and regulations imposed by the public authorities necessary to protect the rights of the public. When the statutory law grants the right to a riparian owner to extend his lot or to improve out to the limits prescribed by the public authorities, the riparian owner receives a 'franchise—a vested right, peculiar in its nature but a *quasi* property of which the lot owner cannot be lawfully deprived without his consent.' *B & O R. R. Co. v. Chase,* 43 Md. 23, 36 (1875). When the lot owner makes improvements in front of his lot, complete title then vests in him in the improvements provided it is in front of his lot and does not appropriate the riparian rights of his neighbors. *B & O R. R. Co. v. Chase,* 43 Md. at 36-37." (250 Md. at 387, 243 A.2d at 581.)

The Act of 1785 was intended, so far as the port of Annapolis was concerned, to authorize the creation of the Port Wardens, with definite powers to regulate and limit the extent and construction of wharves to be erected by riparian owners.[4] The

---

4. It should be remembered that the Act of 1785 was passed while the Articles of Confederation, effective in Maryland on March 1, 1781, were in effect and prior to the effective date of the United States Constitution on March 4, 1789. The United States

statutory setting and the preamble to the Act of 1785 itself, in-
dicate that the General Assembly intended that the Port War-
dens have the designated powers and no other and that the scope
of the appeal to the Mayor and Aldermen should be confined
to the consideration of those powers and duties.

### (2)

In considering the question of whether there was legally suf-
ficient evidence to support the action of the Mayor and Alder-
men in reducing the length of the pier from 62 to 55 feet and
the number of slips from four to two, it was contended by the
appellants that the appeal was a trial *de novo* in which the par-
ties could—as they did—present new and additional evidence
from that presented before the Port Wardens. We need not
decide this question in that, assuming, *arguendo,* that the ap-
peal contemplated a hearing *de novo,* we are of the opinion that
there was not sufficient evidence to sustain the action of the
Mayor and Aldermen which was, in a legal sense, arbitrary,
capricious and unreasonable and, therefore, null and void as the
Chancellor decided.

As we have indicated, there was a large amount of evidence
at the hearings before the Mayor and Aldermen but there was
*no evidence* that the 62 foot *length* of the pier was considered
to be a peril to navigation in Weems Creek or that this length
would "render the navigation * * * too close and confined."
On the contrary, Mr. Lunter, one of the appellants, testified:

> "We don't fear a sixty foot pier being built, but
> we do fear for boats there to be used as a private

---

under the Articles of Confederation had no power to regulate in-
terstate commerce and there were no federal courts to exercise
the admiralty and maritime jurisdiction conferred upon the new
federal courts by the Federal Constitution, so that in 1785 the
State of Maryland not only had title to land under navigable waters,
but also had full, complete and plenary power to regulate naviga-
tion in navigable waters. After the effective date of the Federal
Constitution and the implementing Acts of Congress, the regula-
tion of interstate commerce gave the federal government certain
powers over the extent to which obstructions could be erected in
navigable waters—hence the necessity to submit the application to
the United States Corps of Engineers for consideration and ap-
proval.

marina, for rendezvousing, and then we being back in this cove, and not only ourselves, but the people on the Severn, going towards Severn River, being back in some coves there, are going to have this same problem of pollution."

Admiral Heineman testified that there were in Weems Creek piers which apparently projected out 60 feet and he estimated the average as approximately 40 feet. Mr. Buchanan, President of the Wardour Improvement Association consisting of 70 families in Wardour, testified:

"Their objection to the application for this pier, really involved the intent and the fact that there were multiple pier or for multiple boats at a location which is entirely residential. We worry about the pollution of the Creek. We worry about the fact that it is a residential area, and we would like to keep it that way. And, I think this is primarily the objections that the citizens of Wardour have. I don't think there was any desire on their part to keep a bona fide owner of property from having a pier that was necessary to house his boat. But this seemed to be something that was a little unusual for one owner to have four boats on one pier."

There was no objection or any evidence in regard to the width of the pier, its materials or construction.

In summary, the objections of those opposing the issuance of the license to erect the pier were in regard to the possible use of the pier for commercial purposes or by more boats than supposedly permitted in a Residential C zone and the possible use of toilets on boats moored to the pier thus causing pollution in Weems Creek.

In regard to the objection relating to use, the problem, if any, is a zoning problem over which, as we have seen, the Port Wardens have no jurisdiction. Laudeman, who is a member of the Bar, testified that he had no intention of changing the residential character of the neighborhood and, indeed, offered to execute and record a covenant running with the land to insure

the enforceability of this representation. He also stated his reasons for needing a 62 foot pier and why this length would be satisfactory to him after a close investigation of the depth of the water, thereby obviating the necessity for any cross-appeal on his part from the decision of the Port Wardens.

So far as pollution from use of toilet facilities on the boats is concerned, counsel for the applicant pointed out how unlikely it would be that this would result, as the property of Laudeman would be the one most adversely affected by it and, moreover, there would be no necessity for such use while the boats were moored less than 62 feet from the shore with toilet facilities available on land. In any event, the Port Wardens have no jurisdiction over the problem of pollution. Whatever jurisdiction over this problem is given by the Code of the City has been granted to the Health Officer. Here again, if and when pollution attributable to the use of toilets on the moored boats occurs, any neighboring property adversely affected and specifically injured will most likely have appropriate remedies available to protect themselves. See, e.g., Section 13-1 and Section 14-5 of the City Code in regard to the casting or throwing of filth into the waters or on the shore and the power of the Health Officer to require the removal of filth which has become a nuisance. It should be pointed out, however, that our predecessors have held that so far as the prevention and removal of nuisances by the City are concerned, only those nuisances which are declared to be such by ordinance or were nuisances at common law may be prevented or removed by the City. See *Burley v. City of Annapolis,* 182 Md. 307, 311-12, 34 A. 2d 603, 605 (1943). In fact, there was no credible evidence before the Mayor and Aldermen of any pollution or of the likelihood of its occurrence and there was positive evidence that it would not likely occur. If and when it may occur in the future, there appear to be adequate remedies, both public and private, to resolve the danger.

William R. Jackson, the City Engineer, who is a Port Warden and who acts as chairman of that body, testified in regard to the action of the Port Wardens in granting a 62 foot pier (vs. the 90 foot pier requested), and that, in his opinion, the Port Wardens had no jurisdiction to consider either zoning or

health problems possibly arising from the use of boats at the pier. He indicated that the Port Wardens, like the Army Engineers, were primarily concerned with navigation.

The evidence indicated that Weems Creek and Spa Creek were comparable bodies of water. The depth of water in the channel is approximately the same ranging from 8 to 12 feet in Weems Creek and 7 to 12 feet in Spa Creek. The boat traffic in Weems Creek is far less than that in Spa Creek indicating that there is less congestion of navigation in Weems Creek than there is in Spa Creek. Then too, as has already been observed, there are existing 60 foot piers in Weems Creek which have not interfered with navigation.

The evidence was uncontradicted that four persons had an interest in the property of Laudeman and that the dwelling had a tenant. Laudeman testified that he ultimately hoped to have four apartments in the dwelling house. It would seem clear that the granting of four slips by the Port Wardens was not unreasonable but was supported by substantial evidence. There was no evidence before the Mayor and Aldermen indicating that this action by the Port Wardens was unreasonable, arbitrary or capricious.

The decision of the Port Wardens in regard to the length of the pier, its location and construction and the number of slips granted by the license was fully supported by the evidence and there was no legally sufficient evidence indicating that this decision was incorrect.

Not only did counsel for Laudeman point out that, in his opinion, the Mayor and Aldermen had no jurisdiction to consider zoning and health problems on the appeal from the Port Wardens, but this opinion was in effect confirmed by the town attorney who stated at the first hearing:

> "* * * [A]ny decision you make, has got to be supported by substantial evidence as required by the City Code. And that deals only with congestion and hazards to navigation."

Unfortunately this good advice was not taken by the Mayor and Aldermen. The action of the Mayor and Aldermen in reduc-

216

ing the length of the pier and number of slips was unsupported by substantial evidence, and was, therefore, in law, arbitrary, unreasonable and capricious action. The Chancellor was correct in declaring such action null and void. See *State Department of Health v. Walker*, 238 Md. 512, 209 A. 2d 555 (1965), *Serio v. Mayor and City Council of Baltimore*, 208 Md. 545, 119 A. 2d 387 (1956). *Cf. Daniel Loughran Co. v. Lord Baltimore Candy & Tobacco Co.*, 178 Md. 38, 12 A. 2d 201 (1940).

*Decree affirmed, the costs to be paid by the appellants.*