# PORT WARDENS OF ANNAPOLIS ET AL. *v.* MARYLAND CAPITAL YACHT CLUB

[No. 289, September Term, 1970.]

*Decided February 9, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Eugene M. Lerner, City Attorney,* for appellants.

*C. Edward Hartman, II,* with whom were *Hartman & Crain* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

This appeal involves an application by the appellee, Maryland Capital Yacht Club, a non-profit corporation of the State of Maryland, plaintiff below (Yacht Club), to erect a bulkhead, piers, breakwater, pilings and related structures and to dredge and fill, in the Severn River, in Annapolis, contiguous to its property. The Port Wardens of Annapolis, one of the appellants and one of the defendants below, after a hearing, denied a portion of the application for 100 slips, limiting the number to 56 slips. On appeal to the Mayor and Aldermen of Annapolis, the other appellant and defendant below, after a hearing at which, in addition to the record before the Port Wardens, additional evidence was introduced, the decision of the Port Wardens was affirmed. The Yacht Club then filed a bill of complaint in the Circuit Court for Anne Arundel County, in equity, for a declaration that the resolutions of the Port Wardens and the Mayor and Aldermen were null and void; that the Port Wardens grant the full application of the Yacht Club; and, that the Mayor and Aldermen issue the building permit in accordance with the application. The Chancellor, Judge Childs, filed a written opinion and by a decree of July 20, 1970, granted the relief prayed for in the bill of complaint. A timely appeal was taken from this decree.

Two principal questions are presented to us:

1. Was there sufficient evidence before the Port Wardens to support the denial of the portion of the application for the 44 slip area?

2. Was the proceeding before the Mayor and Aldermen an appeal confined to the record of proceedings before the Port Wardens or was it a hearing *de novo?*

The Yacht Club owns a tract of land in Annapolis in the Eastport area. It is bounded generally on the north by Murphy Street, on the west by First Street, on the south by Chesapeake Avenue and on the east by the Severn River.

On December 10, 1968, the Yacht Club filed its application to construct a bulkhead across the 345 foot water frontage of its land, consisting of approximately two and one-half acres and bounded as already set forth. The application also asked permission to dredge material in front of that bulkhead, to fill behind it and then to construct 100 boat slips in the dredged area to be protected by a breakwater. It was further proposed to dredge an access channel, 60 feet wide and 6 feet deep, from the slip area to the natural six foot deep water approximately 600 feet away.

The existing bulkhead extends into the Severn River from the end of Chesapeake Avenue, a distance of 180 feet. The new proposed bulkhead would be erected toward the river from the end of Murphy Street 265 feet to intersect the 345 foot section. Outboard of the 345 foot bulkhead, there would be two mooring slip areas enclosed on the east and on the south by timber breakwaters. The inboard slip area was designed for 56 slips; the outboard area was to accommodate 44 slips—a total of 100 slips, as we have indicated. Inasmuch as the existing depth of water in the immediate vicinity would limit navigation to boats drawing only a few inches of water, it was proposed that the 60 foot channel be dredged to the one fathom line of the Severn River.

The piers would extend 251 feet out from the bulkhead and the entire project, including the filled area and piers,

would extend 300 feet from the shore line at the Chesapeake Avenue edge of the subject property and 250 feet from the end of the existing jetty. It would be 1040 feet from the nearest channel as delineated by the Army Engineers and 3150 feet from the Severn River Channel.

The materials to be used for this construction were to be pressure-creosoted wood secured with mild steel galvanized bolts and guys. No question has been raised in regard to the designs, the method of dredging or the fill material.

### (1)

A hearing on the Yacht Club application was held by the Port Wardens on November 20, 1969. After a full presentation by the Yacht Club of the details in regard to the project involved in its application, including testimony in regard to its location, the dimensions, the design, type of materials to be used and other relevant data, as well as evidence indicating that the proposal would not render navigation in the port of Annapolis too close and confined, only two witnesses testified in opposition to the granting of the application. One of these witnesses, Mrs. Parker Fairlamb, who resides at No. 1 Severn Avenue— between Murphy Street and Severn Avenue, near the subject property, and who, with her husband, owns two of the three houses between the two streets—stated that her principal concerns were (1) possible erosion resulting from the erection of the proposed bulkhead and (2) the possibility that the proposed construction would act as a "trap for refuse." When asked by one of the Port Wardens whether the proposed construction would impede her navigation, she replied:

> "I don't think so. If I had a boat, I would
> go straight out. What it would impede is all the
> fishing and crabbing that goes on there."

The other witness, Commander Horn, when asked by the same Port Warden whether the Commander thought that the pier extension would impede navigation in any way, replied:

"Well, I can't see that it would conflict with navigation. The statement has been made that the water is not navigable. Then how can you interfere with navigation if the water is not navigable."

The Port Wardens did not decide the case before them on the day of the hearing, but reassembled on Monday evening, November 24, 1969, to dispose of the matter. At this meeting, a motion to reject the application entirely was rejected by a vote of two in favor and three opposed. A motion was then made that the proposed piers "be limited to 116 feet in length, and that the landfill and bulkhead be approved as submitted and that the slips be limited to 56 in number." This motion passed unanimously. It was then stated in the minutes of this meeting:

"The Port Wardens felt that the piers should be limited as it could cause some interference to navigation to small boats and the Port Wardens restricted the decision to this."

Thereafter, on December 19, 1969, the decision of the Port Wardens was appealed by the Yacht Club to the Mayor and Aldermen. The hearing on the appeal was held before the Mayor and Aldermen on January 26, 1970. The transcript of the proceeedings before the Port Wardens was duly admitted into evidence and counsel for the Yacht Club stated to the Mayor and Aldermen that it was their "duty to consider this appeal solely on the question of navigation, and solely on the record that is before you."

Notwithstanding this statement by counsel for the Yacht Club, the Chancellor aptly described in his opinion what then occurred, as follows:

"It is apparent from reading the transcript of that meeting that it soon degenerated into a general animated discussion of zoning, parking problems, appeals to preserve the general ecology, discussion of legal theory, discussion of erosion and the implied impugning of the verac-

ity of the witnesses. The Mayor and Aldermen entered wholeheartedly into the discussion of all aspects of these matters, some testifying as fully as any witness might. The result of the hearing was the affirmation of the Port Wardens' action. The resolution entered in the minutes of the regular meeting of the Mayor and Aldermen held on February 9, 1970 reads,

" 'Alderman Dignan said after long and due consideration, we have to come to conclusion that it is only just to uphold the Port Wardens. He so moved, the motion seconded by Alderman Whelan. Roll Call vote all in favor, motion adopted.' "

There was, however, some testimony taken before the Mayor and Aldermen which had some possible relation to the effect on navigation by the proposed construction.

Mrs. Parker Fairlamb, who had testified before the Port Wardens, as we have indicated, mentioned her testimony, already quoted, before the Port Wardens but then stated:

"All boats don't require the depth of water in the channel, and anyone who lives in that area knows that many small boats operate in that area all the time, spring, summer and fall."

Lawrence Johnson, who stated that he sailed a small boat in and around Annapolis during the entire year, testified that he and other members of the Severn Sailing Association (with a membership of between 225 and 250) quite frequently sail within several hundred feet of the beach and the proposed bulkheads would extend past the area normally used by them for sailing. He was "sure it will quite often impede our sailing." * * * "On several other occasions, we do sail under the shore line there. We don't get in much closer than that."

Mr. Johnson later stated that he questioned "the need for another club."

Parker Fairlamb, the husband of Mrs. Fairlamb who had testified, as we have seen, both before the Port Wardens and the Mayor and Aldermen, testified that:

"We contend that the distance requested is excessive and will affect navigation and very substantially."

He further stated:

"As to the accessibility of boats to that area, I would like to say and reinforce what Mr. Johnson said, as well as my wife, there's a very lively sailing of sailboats, very little in the way of large cruisers, thank God, in this area. I happen to own a fairly large cruiser. I could have brought it in to our bulkhead. My son owns a small cruiser which he brings in our bulkhead. Those boats have approximately two and a half to three foot drawings. The sailboats, however, are either keel boats or centerboard crafts, and they can sail in there and I have a son-in-law who sails a light thing, approximately a twenty-foot boat which he sails right into the shoreline there where we are. Boats from the Naval Academy, the midshipmen sail their boats in this area and it's a very lively area in the summertime."

At the hearing before the Chancellor the transcripts of the hearings before both the Port Wardens and the Mayor and Aldermen were introduced, including the various plats and other exhibits mentioned in those transcripts or attached to the bill of complaint.

The Chancellor began his opinion with the pertinent observation:

"This case could easily be referred to as *Lunter v. Laudeman,* [251 Md. 203, 246 A. 2d 540 (1968)] revisited. The only essential legal difference lies in the fact that the Mayor and City Council on appeal affirmed the action of the Port

Wardens of the Mayor and Aldermen of Annapolis."

As we see it, however, there is one other essential legal difference, *i.e.*, that in *Lunter* we did not find it necessary to decide whether or not the appeal from the Port Wardens was an appeal confined to the record made before the Port Wardens or was a hearing *de novo* while in the present case we will make that decision.

In *Lunter* we reviewed in some detail the statutes applicable to the Port Wardens, the historical background of those ordinances and generally their scope and effect. We stated:

> "Section 38 of the Charter of the City confers power on the Port Wardens *to determine upon and regulate all matters* (1) relating to the *erection or building of wharves* in the port; (2) the *distance* the wharves *extend into the water;* and (3) the *materials* of which the wharves are constructed and the *manner* and *form* of such construction. All of these powers are subject to the overriding purpose of the grant of power, i.e., keeping in view (a) the preservation of the navigation of the port by not permitting any wharf to render navigation *too close* and *confined* or (b) to be built of such materials and constructed in such a manner as will be deemed *not sufficiently substantial and lasting.* This is the scope of the grant of power by the General Assembly to the Port Wardens."

(Emphasis in the opinion in *Lunter*.)
(251 Md. at 208; 246 A. 2d at 543.)

\* \* \*

> "The Port Wardens do not have any power to enforce or construe any applicable zoning laws or regulations. These zoning ordinances appear in Chapter 26 of the Code of the City and have an entire and complete system of enforcement entirely apart from any power exercised by the

Port Wardens. Appeals under the zoning ordinances of the City must be taken to the Board of Appeals as provided for in Sections 26-38 and 26-39 of the Code. This Board of Appeals was created pursuant to a specific grant of legislative power by the General Assembly in the Act of 1933, Chapter 599 (Code (1957), Art. 66B, Secs. 10-37). Section 26-38(a) of the City Code recites that the Board of Appeals is created in accordance with that Act. We, and our predecessors, have held that the zoning powers of municipal corporations are derived from the State Enabling Acts and not from any general grant of the State's police power to municipal corporations. See *Gino's, Inc. v. Mayor and City Council of Baltimore,* 250 Md. 621, 630-31, 244 A. 2d 218, 223-24 (1968) and Maryland cases cited therein.

"The enforcement of the police powers in regard to health is provided for in Chapter 14 of the Code of the City. This enforcement power is given to the health officers and no part of that power is given to the Port Wardens." (251 Md. at 209; 246 A. 2d at 544.)

\* \* \*

"In considering the question of whether there was legally sufficient evidence to support the action of the Mayor and Aldermen in reducing the length of the pier from 62 to 55 feet and the number of slips from four to two, it was contended by the appellants that the appeal was a trial *de novo* in which the parties could—as they did—present new and additional evidence from that presented before the Port Wardens. We need not decide this question in that, assuming, *arguendo,* that the appeal contemplated a hearing *de novo,* we are of the opinion that there was not sufficient evidence to sustain the action of the Mayor and Aldermen which was, in a legal

sense, arbitrary, capricious and unreasonable and, therefore, null and void as the Chancellor decided."
(251 Md. at 212; 246 A. 2d at 545-46.)

The Chancellor in the present case concluded that there was no legally sufficient evidence before either the Port Wardens or before the Mayor and Aldermen which could support the denial of the application as originally presented, and hence their respective actions were arbitrary, unreasonable and capricious and thus a denial of due process of law. See *Lunter v. Laudeman,* 251 Md. 203, at 216, 246 A. 2d 540 at 547, *supra,* and cases therein cited.

We fully agree with the Chancellor's conclusion in regard to the testimony before the Port Wardens. There was simply no testimony whatsoever that the proposed construction would (1) render navigation "too close and confined" or that (2) the project would "be built of materials" and "constructed in such a manner as will be deemed not sufficiently substantial and lasting," the only two matters legally before the Port Wardens for their determination. Indeed, there was and is, as we have observed, no contention between the parties in regard to the materials and the manner of construction; and the affirmative evidence offered on behalf of the applicant and on behalf of the protestants was all to the effect that the proposal would have no adverse effect upon navigation.

When we consider the evidence taken before the Mayor and Aldermen, however, in addition to the record made before the Port Wardens, it is not nearly so clear that there is *no* evidence legally sufficient to support a denial by the Mayor and Aldermen of the portion of the proposal already mentioned. Admittedly, the great *weight* of the evidence before the Mayor and Aldermen is to the effect that the entire proposal would not render navigation too close and confined; but under our decisions and those of our predecessors, this is not enough for us to hold that the action of the legislative body is arbitrary, unreasonable or capricious, and thus a denial of due process of

law. See *Tauber v. County Board of Appeals for Montgomery County,* 257 Md. 202, 212, 262 A. 2d 513, 518 (1970).

The effect of the decisions of this Court on this subject is well stated in Cohen, *Some Aspects of Maryland Administrative Law,* 24 Md.L.Rev. 1 at p. 38 where it is stated:

> "It is said to be the general practice of courts, when reviewing a decision of an administrative agency, to uphold the agency's findings of fact unless they are arbitrary. This practice is often referred to as the 'substantial evidence rule', meaning, that an agency's findings of fact will be upheld as long as there is some reliable evidence in the record to support such findings, even though the weight of the evidence is to the contrary. To give a simple illustration of the rule, assume that in an agency hearing five witnesses testify on one side of a proposition, and one witness testifies on the other. In its findings, the agency states that it does not doubt the credibility of any of the witnesses, but that it is relying on the testimony of the one witness and disregarding that of the five. Under the substantial evidence rule, a court would be required to uphold such findings."

See also Oppenheimer (later a judge of this Court), *Administrative Law in Maryland,* 2 Md.L.Rev. 185, 208-09 (1938) where the distinguished author states:

> "In no other phase of the subject has the liberal attitude of the Court of Appeals been more marked than in the much mooted matter of the scope of judicial review. The position of the Court has been consistent; it will not substitute its own judgment on the facts for the finding of the administrative agency."

It may well be argued that the testimony of the pro-

testants before the Mayor and Aldermen, already mentioned, did not really meet or sustain a finding that the portion of the application denied by the Mayor and Aldermen did render navigation too close and confined. This presents a borderline situation and we prefer in the present case to assume, *arguendo,* without deciding, that such evidence was sufficient to sustain the action of the Mayor and Aldermen and decide whether or not the appeal from the decision of the Port Wardens was confined to the record before them or if it was a hearing *de novo.* Obviously, if the hearing before the Mayor and Aldermen was confined to the record before the Port Wardens and was not an appeal *de novo,* the decree of July 20, 1970, must be affirmed for the reasons already stated. We now turn to this issue.

(2)

The applicable statute is Section 40 of the Charter of the City of Annapolis, contained in the Code of the City of Annapolis, Maryland (Michie, 1969), which provides:

> "In all differences that shall arise between any citizen of Annapolis and the said wardens, touching the discharge of their duty, an appeal shall lie to the mayor and aldermen."

Section 40 follows Section 38 providing for the general powers of the Port Wardens and Section 39 requiring a license, issued by the Port Wardens, to build any wharf or carry out any earth or other material for that purpose.

The provisions of the statute are the primary source for the determination of whether the appeal is confined to the record made before the Port Wardens or contemplates a hearing *de novo.* See *Lee v. Sec. of State & Mahoney,* 251 Md. 134, 139, 246 A. 2d 562, 566 (1968).

We have concluded that the appeal to the Mayor and Aldermen from the Port Wardens is confined to the record made before the Port Wardens and that no *de novo* hearing is contemplated.

The source of Section 40 is Section VIII of the Act of 1785, Chapter 26, as we pointed out in *Lunter v. Laude-*

*man, supra* (251 Md. at 210; 246 A. 2d at 544). The appeal is to a legislative, rather than to a judicial body, but in our opinion the same rules of construction apply in either situation.

In the first place, the statute provides for *an appeal* and does not state that the hearing before the Mayor and Aldermen shall be *de novo* or that additional evidence may be taken at any hearing on appeal. Ordinarily, in the absence of a statutory provision to the contrary, an appeal is confined to the record made before the administrative body rendering the original decision. See *Volz v. State Roads Commission*, 221 Md. 209, 213-15, 156 A. 2d 671, 673-74 (1959) for a comprehensive review of the Maryland Law in regard to when an "appeal" with an *express provision* for a hearing *de novo* is equivalent to the filing of a new proceeding as contrasted with an ordinary appeal from Administrative Boards.

In considering the provisions of Code (1969 Repl. Vol.), Art. 89B, § 18 in regard to an "appeal" from the Board of Property Review in condemnation cases of the State Roads Commission of Maryland to the Circuit Court, Judge Horney, for the Court, stated:

> "It is evident that the Legislature, in enacting the statute now under consideration, intended to and did distinguish between an appeal, *in its ordinary or usual sense,* from other administrative agencies or quasi-judicial boards, and an appeal, *in the non-technical sense,* from the property review board. Here the 'application' by either party, howsoever made, for the filing of a condemnation proceeding to be tried anew constitutes the 'appeal.' Read in this sense, the statute simply provides that either party to the review board proceeding, who is dissatisfied with the findings and award of that board, has the right, within thirty days, to 'apply for' a condemnation case to be filed in court and heard *de novo* as the new and independent action it is.

*Purcell Bank & Trust Co. v. Byars,* 66 Okla. 70, 167 Pac. 216 (1917)."
(221 Md. 214-15, 156 A. 2d 674; emphasis in the opinion in *Volz.*)

Secondly, the original decision is made by persons specially appointed for the determination of a specialized matter requiring some expertise on the part of the members of the administrative body. Under these circumstances, it can reasonably be assumed that the facts be presented to the administrative body for its special consideration and that no hearing *de novo* on appeal would be contemplated.

Thirdly, the language of Section 40, itself, appears to be restrictive and involves "differences. . .touching the discharge of their [the Port Wardens'] duty," rather than a general or complete rehearing on appeal. We held in *Lunter* that this language confined the scope of appeal to the issues properly raised under Section 38, to which reference has already been made (see *Lunter,* 251 Md. at 210; 246 A. 2d at 544). This language also will reasonably indicate that no *de novo* hearing on appeal was contemplated.

Fourthly, an examination of the 1960 Code of the City of Annapolis, Maryland, which contained both Section 40 of the Charter and Section 26-40 (4) of the Code [since repealed], indicates that *when* it was intended that additional testimony be taken on an appeal from an administrative body, this intent was specifically set forth in the statute and provision made for this, being done by specific action by the court on appeal, either by itself hearing the additional testimony or by appointment of a referee to hear the additional testimony and to report his findings of fact and conclusions of law to the court. See Section 26-40 (4) [since repealed], Code of the City of Annapolis, Maryland (Michie, 1960) in regard to appeals to the Circuit Court for Anne Arundel County. The absence of any such provisions in Section 40 of the Charter when compared to their presence in a somewhat analogous

situation, emphasizes that it was not intended that there be additional testimony taken or a hearing *de novo* on the appeal from the decision of the Port Wardens.

For a review of the provisions of various zoning ordinances of Baltimore City in regard to *de novo* hearings on appeal from the administrative body, see *Dorman v. Mayor and City Council of Baltimore*, 187 Md. 678, 689; 51 A. 2d 658, 663 (1947).

We, therefore, need not consider the additional evidence introduced before the Mayor and Aldermen on appeal inasmuch as the hearing on appeal was confined to the record made before the Port Wardens, which, as we have indicated, was clearly insufficient to justify a denial of the portion of the application disapproved by the Port Wardens. The decree of July 20, 1970, being correct, will be affirmed.

> *Decree of July 20, 1970, affirmed, the appellants to pay the costs.*